UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------X

NAVIG8 POOL INC.,

             Petitioner,

   -against-

STANDARD TANKERS BAHAMAS LTD.
UK BRANCH,

             Respondent.

------------------------------X



10 Civ 8980

VERIFIED PETITION

    PLEASE TAKE NOTICE that Petitioner, NAVIG8 POOL INC. ("NAVIG8"), by its attorneys Mahoney & Keane LLP, as and for its Petition to compel arbitration with Respondent, STANDARD TANKERS BAHAMAS LTD. ("STB"), alleges, upon information and belief, as follows:

    1.   This is a case of admiralty and maritime jurisdiction within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

    2.   This Court's jurisdiction over this matter is based upon the Federal Arbitration Act, 9 U.S.C. §1 et seq. [hereinafter "FAA"], 28 U.S.C. §1333 (admiralty), 28 U.S.C. §1332 (diversity), 28 U.S.C. § 1331 (federal question), as well as the Court's pendent, supplementary and ancillary jurisdiction.

    3.   The District Court for the Southern District of New York is the proper venue for this matter pursuant to the FAA,

inasmuch as the subject agreement between the parties called for arbitration in this District under New York law.

4.   Petitioner, NAVIG8, is a foreign corporation with a place of business located at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands, MH 96960.

5.   Respondent, SBT, is a foreign entity with a place of business located at Mailpoint 34, ExxonMobil House, Ermyn Way, Leatherhead, Surrey KT22 8UX, England, as well as care of E.A. Gibson Ltd., P.O. Box 278, Audrey House, 16-20 Eli Place, London EC1P 1HP, England and ExxonMobil Business Support Center Hungary Ltd., H-1139 Budapest, VACI UT 81-85, Centre Point Building, 4th Floor, Hungary.

6.   On or about November 24, 2009, Petitioner, NAVIG8, as disponent owner, and Respondent, SBT, as charterer, entered into an ExxonMobilVoy 2005 form charter of the M/V ABU DHABI STAR for the ocean carriage of SBT's cargo from Bonny, Nigeria to Jacksonville, Florida. True copies of the Fixture Recap and incorporated voyage charter form are herewith attached as Exhibit 1.

7.   Demurrage then accrued, and NAVIG8 sought payment from SBT as required under the charter party. True copies of NAVIG8 Demurrage Invoices and Laytime Calculations are herewith attached as Exhibit 2.

19/4059                                    2

8.   SBT disputed and declined to pay NAVIG8's full demurrage assessment, so, on or about September 15, 2010, NAVIG8 appointed Mr. Manfred Arnold, a member of New York's Society of Maritime Arbitrators, as an arbitrator and called for SBT, in turn, to appoint an arbitrator as required pursuant to the charter party's New York Arbitration clause. A true copy of the demand for arbitration is herewith attached as Exhibit 3. See also, Exhibit 1, at ¶ 35(a).

9.   On or about October 26, 2010, having received no response, NAVIG8's representative again wrote to SBT and warned that the instant Petition might follow should SBT continue to fail to respond. A true copy of the follow-up demand for arbitration is herewith attached as Exhibit 4.

10.   SBT breached the terms of the charter party by failing to pay demurrage due and owing to NAVIG8 and by failing to proceed with the arbitration duly commenced by NAVIG8.

11.   Pursuant to the FAA, a party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition the United States District Court for an order directing that such arbitration proceed in the manner provided for in such agreement. 9 U.S.C. § 4.

12. Pursuant to the FAA, if a party fails to avail itself of the method provided in the agreement for naming or appointing an arbitrator, then upon application of either party to the controversy the Court shall designate and appoint an arbitrator who shall act under the said agreement with the same force and effect as if he or she had been specifically named therein. 9 U.S.C. § 5.

WHEREFORE, Petitioner, NAVIG8 INC., seeks an order:

(i)   Compelling Respondent, STANDARD TANKERS BAHAMAS LTD. UK BRANCH, to appoint its arbitrator and proceed with the arbitration;

(ii)  In light of SBT's failure to name an arbitrator, appointing a second arbitrator of the Court's choosing or directing that Manfred Arnold act as sole arbitrator;

(iii) Granting to Petitioner such other and further relief as the Court may deem just and proper.

Dated:   New York, New York
         December 1, 2010

Respectfully submitted,

MAHONEY & KEANE LLP
Attorneys for Petitioner
NAVIG8 INC.

By:

Garth S. Wolfson
11 Hanover Square, Tenth Floor
New York, New York 10005
(212) 385-1422

19/4059                         4

ATTORNEY VERIFICATION

STATE OF NEW YORK      :
                       :  SS.:
COUNTY OF NEW YORK     :

1.   My name is Garth S. Wolfson.

2.   I am over 18 years of age, of sound mind, capable of making this Verification and fully competent to testify to all matters stated herein.

3.   I am the attorney for the Petitioner, and I am fully authorized to make this Verification on its behalf.

4.   I have read the foregoing Complaint and the contents thereof are true and accurate to the best of my knowledge, information and belief.

5.   The reason that this Verification was made by me and not the Petitioner is that the Petitioner is a corporation none of the officers of which are present in this District.

6.   The source of my knowledge is information and records furnished to me by the Petitioner and its representatives, all of which I believe to be true and accurate.

_____
Garth S. Wolfson

Sworn to before me on this
1st day of December, 2010

_____
Notary Public

EDWARD A. KEANE
NOTARY PUBLIC
State of New York No. 02KE6031113
Qualified in New York County
Term Expires  9/27/13

*Exhibit "1"*

**Edward Keane [Mahoney and Keane]**

| | |
|---|---|
| **From:** | Max Curtis [Max@navig8group.com] |
| **Sent:** | Wednesday, November 25, 2009 6:41 AM |
| **To:** | Navig8 Voyage Estimates & Recaps |
| **Subject:** | ABU DHABI STAR / EXXON - REVISED FINAL RECAP - CP DTD 24/11/09 |

```
-----Original Message-----
From: E A Gibson Ltd. - Clean (Yates Daniel) [mailto:clean@eagibson.co.uk]
Sent: 25 November 2009 10:02
To: clean@eagibson.co.uk
Subject: ABU DHABI STAR / EXXON - REVISED FINAL RECAP ** MSG#:<688357>


TO: EXXON                          ATTN: JOHN KELLY
TO: NAVIG8                         ATTN: MAX CURTIS


RE: ABU DHABI STAR / EXXON - CP DTD 24-11-09 ==============================================

WITH CHARTERERS AUTHORITY, I AM PLEASED TO CONFIRM THE FOLLOWING FIXTURE WITH ALL SUBJECTS
LIFTED AND CP DATED TUESDAY 24TH NOVEMBER 2009.

PRIVATE AND CONFIDENTIAL
=========================

                        (TITLE)

CHARTERER                 : STANDARD TANKERS BAHAMAS LTD. UK BRANCH

HEAD OWNERS               : ABU DHABI STAR PTE LTD.
TECHNICAL OPS             : PIONEER SHIP MANAGEMENT SERVICES LLC.
COMMERCIAL OPS            : STAR MARITIME PTE LTD.
DISPONENT OWNER           : NAVIG8 POOL INC

BROKER                    : E.A. GIBSON  SHIPBROKERS

CHARTER PARTY             : EXXONMOBILVOY 2005
DATED                     : 24TH NOVEMBER 2009


=================================================
                    (VESSEL)

VESSEL     : ABU DHABI STAR
EX-NAME    : NOT APPLICABLE
SDWT       : 51068.6 MT
SDRAFT     : 13.150 M
LOA        : 183.00 M
BEAM       : 32.20 M
FLAG       : SINGAPORE
BUILT      : FEB 25, 2008
CLASS      : LLOYDS REGISTER
STOPPERS   : 1  X 200 MT - TONGUE TYPE
CHAIN SIZE : 76 MM
CUBIC 98 PCT : 52232.2 M3
```

```
SLOP 98 PCT    : 1403.2 M3
SEGREGATIONS : 6
PUMPS          : 14 X 7800 CU. METRES/HOUR (HYDRAULIC DRIVEN DEEP WELL SUBMERGED PUMPS)
TPC/TPI        : 51.98 MT / 132.029 MT
BCM            : 92.90 M
KTM            : 45.8 M
IGS            : YES
COW            : NO
SBT/CBT        : SBT
VRS            : YES
GRT            : 29734
NRT            : 13645
PCNT           : 24682
SCNT           : 26595.23
DERRICKS       : 0  X 0 MT
CRANES         : 1  X 10 MT
COATED         : EPOXY
HULL           : DOUBLE HULL
CALL SIGN      : 9VBM2
P AND I        : NORTH OF ENGLAND
QUALIFIED IND: O'BRIEN'S OIL POLLUTION SERVICES
OSRO           : NATIONAL RESPONSE CORPORATION
COC/TVEL       : JUL 06, 2010
ISPS           : JUL 30, 2013
```

LAST 3 CARGOES: UMS / UMS / JET (OWNERS CONFIRM ALL 3 LAST CARGOES MTBE/ETBE AND OXYGENATES FREE)

APPROVALS: BP / EXXON / REPSOL / SHELL / STATOIL / CONOCO

==========================================================

(CARGO)

CARGO QUANTITY          : MIN 30,000 MTONS CHARTERERS OPTION UPTO FULL
                          CARGO, NO DEADFREIGHT FOR CHRTS ACCOUNT PROVIDED
                          MIN QUANTITY SUPPLIED SG 0.672, TEMP 27DEG C

GRADE                   : CPP UNLDD UND 2.5 NPA EXCL LUBES/SOLVENT/
                          CASINGHEAD/MTBE/CAUSTIC

SEGREGATION             : MAXIMUM 1/2 GRADES WITHIN VESSEL'S
                          NATURAL SEGREGATION.

HEAT                    : N/A

==========================================================
(DATES)

LAY/CAN                 : (00.01HRS) 30TH NOV - (23.59HRS) 02ND DEC, 2009

POSITION                : CURRENTLY FREE OF CARGO OFF TEMA

ITINERARY               : AS ABOVE

==========================================================
(GEOGRAPHICAL)

2

```
LOAD RANGE              : 1 SP BONNY

DISCHARGING RANGE       : 1/2 SP USAC IF NYNNOGWB AND/OR CHOPT
                          1/2 SP USG,E.C.MEXICO EXCL MISSI RIVER AND/OR CHOPT
                          1/2 SP CARIBS EXCL CUBA, HAITI AND ORINOCO RIVER
                          PORTS
```

**OWNERS ESTIMATE WAR RISK PREMIUM FOR BONNY RIVER LOAD TO BE USD 64,327.50**

===========================================================
                        (FINANCIAL)

```
FREIGHT                 :  WS 82.5

OVERAGE                 :  50 PCT

DEMURRAGE               :  USD 16,250 PDPR
```

===========================================================

                        (OTHER TERMS)

```
LAYTIME                 :  72 HRS SHINC

CHARTER SPEED           :  13.5 KNOTS

COW                     :  N/A
```

```
FREIGHT:                : BENEFICIARY: NAVIG8 POOL INC.
ACCOUNT NO.:  0-850600-007
ACCOUNT WITH : CITIBANK, N.A., SINGAPORE BRANCH TRANSACTION EXCHANGE CENTRE
3 TEMASEK AVENUE, #11-00 CENTENNIAL TOWER, SINGAPORE 039190 SWIFT CODE : CITISGSG BANK CODE :
7214 BRANCH CODE : 001
```

===========================================================

                      (SPECIAL PROVISIONS)

THE SPECIAL PROVISIONS SET FORTH BELOW SHALL BE DEEMED TO BE INCORPORATED AND MADE A PART OF
PART 1 OF THIS CHARTER:

EXXONMOBIL VOY2005
------------------

EXXONMOBILVOY2005 PART II & SPECIAL CLAUSES

```
PART II        -CLAUSE 18H) -LINE 362 AFTER "RESPECT THERETO" INSERT "PROVIDED
               LIQUID CARGO IS DEEMED PUMPABLE AND REACHABLE BY VESSEL'S FIXED
               EQUIPMENT"
               -AT END ADD 'SHOULD OWNER ASSERT THAT ROB CARGO IS NOT
               REACHABLE OR PUMPABLE, OWNER SHALL PROVIDE CHARTERER
               WITH SATISFACTORY DOCUMENTARY EVIDENCE TO DEMONSTRATE
               SAME IE. SURVEYORS REPORT'
```

-CLAUSE 25 (HEAT) DELETE

```
------------------------------------
EXXONMOBIL VOY2005 SPECIAL CLAUSES
------------------------------------
```

1. ASSIGNMENT
2. AG - DELETE AS NOT APPLICABLE
3. BONIFACIO STRAITS
4. BLENDING CLAUSE - DELETE AS NOT APPLICABLE 5.  EFFICIENT DEMURRAGE CLAIM PROCESSING
(EFFECTIVE JULY 1, 2002)
       AFTER 'DULY SIGNED WITH AUTHORISED SIGNATURES' INSERT 'WHERE AVAILABLE'
6. FLORIDA STRAIT TRANSIT
7. HEIGHT OF MANIFOLD (BAYTOWN)
8. ITF CLAUSE
9. MESSINA STRAITS
10. NORTH SEA PILOT/SPECIFIC GUIDES (SEPT 2009) 11. PORT STANVAC CLAUSE - DELETE AS NOT
APPLICABLE 12. ROTTERDAM HARBOUR DUES 13. SECURITY REGULATIONS CLAUSE (EFFECTIVE JUNE 10,
2004) 14. SPEED UP - DELETE 15. STORAGE - DELETE 16. TURKISH STRAITS - IF APPLICABLE 17. US
GULF LIGHTERING WARRANTIES (VER.2005-1) - DELETE AS NOT
       APPLICABLE
18. VESSEL EXPERIENCE FACTOR (ARZEW/MEXICO) - DELETE AS NOT APPLICABLE 19. VGO CLEANING 20-
25. OUTCHARTERS/CO-LOADS  - DELETE AS NOT APPLICABLE 26. SUPPLEMENTAL CARGO MEASUREMENT AND
SAMPLING CLAUSE

```
-----------------
ADDITIONAL CLAUSES
-----------------
```

WEST AFRICA CLAUSES:
MAX PORTCOSTS FOR OWNERS ACCOUNT IN WAFRICA IS USD 15,000 BALANCE CHARTERER¿S ACCOUNT.

ANY TAXES AND/OR DUES ON CARGO AND/OR FREIGHT INCLUDING BUT NOT LIMITED TO NIGERIAN
CONSERVANCY DUES, HANDLING CHARGES, SHIP DUES AND NMA LEVY TO BE FOR CHARTERERS ACCOUNT AND
SETTLED DIRECTLY BY THEM.

IF ANY VETTING ARRANGMENTS FOR SAME AT THEIR TIME AND EXPENSE. SHOULD ANY DELAYS BE INCURRED
SAME TO BE FOR CHARTERERS ACCOUNT.

ANY TIME AWAITING NAVAL CLEARANCE TO BE FOR CHARTERERS ACCOUNT AND COUNT AS LAYTIME OR
DEMURRAGE IF ON DEMURRAGE. WATCHMAN IF REQUIRED TO BE CHARTERERS ACCOUNT.

ANY DELAY IN OBTAINING NIGERIAN TASK FORCE PERMISSION TO ENTER NIGERIAN WATERS TO COUNT IN
FULL USED LAYTIME OR DEMURRAGE IF ON DEMURRAGE. NMA FEE IF IMPOSED NOT TO BE FOR OWNER¿S
ACCT. THE CHARTERERS ARE TO BE RESPONSIBLE FOR THE NMA APPROVALS.

ANY DELAYS IN WEST AFRICA WHETHER BERTHING, SHIFTING, DISCHARGING OR SAILING DUE TO
STRIKES/LOCKS/RESTRAINTS/WORK TO RULE OR GO SLOW TO COUNT IN FULL AS LAYTIME OR DEMURRAGE IF
ON DEMURRAGE AND EXPENSES SO INCURRED IF ANY TO BE FOR CHARTERERS ACCOUNT.

IN ANY WEST AFRICA PORT DUES AND/OR COMMISSION ON CARGO AND/OR FREIGHT AND/OR VESSEL TO BE
FOR CHARTERERS ACCOUNT PROVIDED NOT COVERED BY WORLDSCALE AND TO BE PAID DIRECTLY BY THEM.
CHARTERERS TO RE-IMBURSE OWNERS IMMEDIATELY UPON RECEIPT OF COPY OF OWNERS BANK PAYMENT
INSTRUCTIONS WITH AGENT¿S PAYMENT REQUEST.

ALL BUNKERS CONSUMED FOR DRIFTING TO SAFE AREAS AND RETURNING TO FAIRWAY TO BE FOR CHARTERERS
ACCOUNT AND TO BE PAID TOGETHER WITH ANY UNDISPUTED DEMURRAGE (IF ANY) OR DEMURRAGE. THIS TO
BE SUPPORTED BY MASTERS STATEMENT.

UNDISPUTED DEMURRAGE INCURRED TO BE PAID EVERY 7 DAYS ON ACCOUNT.

EXTRA WAR RISK INSURANCE, IF ANY, INCLUDING CREW WAR BONUSES TO BE FOR CHARTERERS ACCOUNT.

WEATHER CLS
============

IF DISCHARGE FALCONARA/FIUMICINO/RAVENA/GAETA/LA NOUVELLE/SPANISH ATLANTIC/
PORTUGAL/MOHAMMEDIA AND/OR IF LIGHTERING/LIGHTENING/STS TRANSSHIPMENT TAKES PLACE AT/OFF ANY
PORT/PLACE SEA TERMINAL NOT PROTECTED BY BREAKWATER OR IF DISCHARGING VIA SEALINE, ANY DELAYS
DUE TO WEATHER AND/OR SEA CONDITIONS TO COUNT IN FULL (HOWEVER AT 50PCT FOR FIRST 48HRS AT
ECMEXICO) AS LAYTIME OR DEMURRAGE IF VESSEL IS ON DEMURRAGE, AND ANY UNBERTHING/REBERTHING
EXPENSES/TIME DUE TO WEATHER CONDITIONS AT THE ABOVE MENTIONED PORTS/PLACES TO BE FOR
CHARTERERS ACCOUNT. OTHERWISE CONOCO WEATHER CLAUSE TO APPLY.

CHARTERERS INVOICING ADDRESS:

Freight invoice  should be addressed as follows:
Standard Tankers Bahamas
Mailpoint 34
ExxonMobil House
Ermyn Way
Leatherhead
Surrey KT22 8UX
England

Preference is to send the original invoice electronically to Budapest:
intltranspeur@exxonmobil.com
With a copy to:
LPGOPS@exxonmobil.com

If Owners procedure/ preference is to send a hardcopy invoice, then lease send to:
STANDARD TANKERS BAHAMAS LTD - UK BRANCH Center  Point Building
81-85 V ci £t
Budapest H-1139
Hungary
With a copy to:
LPGOPS@exxonmobil.com and intltranspeur@exxonmobil.com

For demurrage invoices, the invoice  needs to be addressed as
following:
STANDARD TANKERS BAHAMAS LTD (UK)
MAILPOINT 34
EXXONMOBIL HOUSE
ERMYN WAY
LEATHERHEAD
SURREY
KT22 8UX

And the hardcopy with the supporting documents needs to be send to:
STANDARD TANKERS BAHAMAS LTD - UK BRANCH C/O EXXONMOBIL BUSINESS SUPPORT CENTER HUNGARY LTD.
H-1139 BUDAPEST, VACI UT 81-85
CENTER POINT BUILDING, 4TH FLOOR
HUNGARY
ATTN: PMI CLAIMS COORDINATION
FAX : 00 36 1 298 5663

1.25PCT ADDRESS ON ALL F/DF/DEM
1.25PCT TO E.A. GIBSON SHIPBROKERS ON ALL F/DF/DEM

+ + +

MANY THANKS YOUR GOOD SUPPORT IN CONCLUDING THE ABOVE FIXTURE.

REGARDS

DAN YATES
EA GIBSON SHIPBROKERS LTD.
+44 207 667 1137
+44 07894 756 675
YAHOO: DAN_YATES88

The information transmitted is intended only for the person or entity to which it is
addressed and may contain confidential and/or privileged material. Any review,
retransmission, dissemination or other use of, or taking of any action in reliance upon, this
information by persons or entities other than the intended recipient is prohibited. If you
received this in error, please contact the sender and delete the material from any computer.

E. A. Gibson Shipbrokers is a limited company registered in England and Wales.
Reg No. 710161. Registered office: E. A. Gibson Shipbrokers Ltd, Audrey House, 16-20 Ely
Place, London. EC1P 1HP

Sent with Danaos Info@Gate Communication Software

# ExxonMobil

---

**tanker voyage charter party**

**ExxonMobil VOY2005**

## PREAMBLE

|  |  |
|---|---|
| PLACE | DATE |

IT IS THIS DAY AGREED between _____ Owner / Chartered Owner
(hereinafter called "Owner") of the _____ Flag MS / SS _____
(hereinafter called "Vessel") and _____ (hereinafter called "Charterer") that the
transportation herein provided for shall be performed subject to the terms and conditions of this Charter, which includes this
Preamble and Part I and II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II to the
extent of such conflict.

## PART I

**(A) VESSEL DESCRIPTION AND POSITION:**

Year built:                    Classed:                    IMO#:

Hull Type (as per IOPPC):          P&I Club:                H&M value:

Summer Deadweight:          Metric tons on          feet/meters in salt water on assigned summer freeboard.

Maximum Cargo Capacity:              Metric tons          % more or less. Vessel's option.

Cubic capacity for cargo (at 98%):          cubic meters / barrels.

Length overall:          feet/meters          Beam:          feet/meters

Inert Gas System:    ❑ Yes    ❑ No

Crude Oil Wash System:          ❑ Yes    ❑ No. If Crude Oil Wash is required, the allowed pumping hours
specified in Part II, Clause 18 (g) shall be increased by a maximum of          hours pursuant to Part II, Clause 18 (g).

Vessel has full segregated ballast tanks (SBT):          ❑ Yes    ❑ No

Vessel has clean ballast tanks (CBT):    ❑ Yes    ❑ No

Cargo Tanks Coated:    ❑ Yes    ❑ No    Type:

Cargo Tanks Coiled:    ❑ Yes    ❑ No    Type:

Last cargo:                    Next to last cargo:

Vessel onboard quantity (gross standard volume) on date of Charter:

Vessel location on date of Charter:

Expected ready to load:

Charter speed in all weather:          knots laden.

**(B) LAYDAYS:**          Commencing:          Cancelling:

**(C) LOADING RANGE(S) / PORT(S) / PLACE(S):** One (1) or          safe

(D) **DISCHARGING RANGE(S) / PORT(S) / PLACE(S):** One (1) or                          safe

(E) **CARGO QUANTITY:**

Full Cargo as defined in Part II, Clause 1 subject to the Maximum Cargo Capacity limits specified in Part I(A):  ❑ Yes  ❑ No
or
Part Cargo Minimum                     Metric tons with Charterer's option to load up to Full Cargo as described in this
Paragraph (E); provided Part Cargo Minimum is supplied by Charterer, no deadfreight for Charterer's account whether option
exercised or not.

(F) **CARGO DESCRIPTION:**

(G) **FREIGHT RATE:**

Freight rate for Full Cargo or Part Cargo Minimum (hereinafter called "Base Freight Rate"):

Freight rate for quantity above Part Cargo Minimum (hereinafter called "Overage Freight Rate"):

(H) **BILLING:**

Freight, deadfreight, demurrage and any other monies payable to Owner pursuant to this Charter shall be payable in
United States dollars and invoiced to Charterer at:

and paid to Owner at:

(I) **LAYTIME:**            Total Laytime in running hours:

(J) **DEMURRAGE / DEVIATION PER DAY:**

In accordance with Part II, Clause 8, demurrage and/or deviation per day shall be based on:

| | | |
|---|---|---|
| Summer deadweight of | Metric tons | |
| or | | |
| Part Cargo Minimum plus | Metric tons totalling | Metric tons |
| or | | |
| United States dollars | per day pro rata | |

(K) **SPECIAL PROVISIONS:**

(L) **INCORPORATED CLAUSE(S):**

The following specified Clause(s), the text(s) of which are attached hereto, shall be deemed incorporated in and made
a part of this Part I.

IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in
duplicate as of the day and year first above written.
WITNESS:

_____          _____
                                                            Owner
                                          By: _____

. WITNESS:

                                          _____
                                                           Charterer
___  _____  _____  _____          By: _____

PART II

1. **DEFINITIONS.** In this Charter:

(a) "place" shall mean any berth, dock, anchorage, sea terminal, submarine line, alongside vessel and/or lighter, whether at anchor or underway, and/or any other place to which Charterer is entitled to order Vessel hereunder.

(b) "ILL Convention" shall mean the International Load Line Convention, 1966, or any amendment thereof as may be applicable to the voyage(s) to be performed hereunder.

(c) "Full Cargo" shall mean a cargo which fills Vessel to its minimum freeboard, as permitted by the ILL Convention, or fills the cubic capacity of Vessel's available cargo spaces, whichever occurs first, after leaving appropriate space in the tanks for the expansion of cargo.

(d) "Arrival in Berth" shall mean the completion of mooring of the Vessel when loading or discharging at a sea terminal, Vessel being all fast with gangway down and secure when loading or discharging alongside a wharf/berth or Vessel being all fast alongside a barge, lighter or other vessel when loading from or discharging to a barge, lighter or other vessel.

(e) Where it is stipulated herein that the Vessel shall meet some "requirement", such stipulation shall be taken to include any requirement that might be placed upon the Owner, operator, and/or personnel of the Vessel.

(f) "Affiliate" shall mean any company which is directly or indirectly owned or controlled, in whole or in part, by Exxon Mobil Corporation.

(g) Where it is stipulated herein that notices, advices, consents, approvals and other communications be given, same may, unless otherwise specified herein, be given by electronic mail, telex, facsimile, telephone or radio (if telephone or radio, subsequently confirmed in writing).

2. **VESSEL.**

(a) DESCRIPTION / CONDITION. Owner warrants that, from the time when the obligation to proceed to the loading port(s) or place(s) attaches and throughout Vessel's service under this Charter, Vessel shall be as described in Part I (A). Owner further warrants that, during the period just described, Owner shall exercise due diligence to ensure that Vessel and its hull, machinery, boilers, all tanks and all other equipment including, but not limited to, pipes, pumps, valves, inert gas and crude oil wash systems (if Vessel is so equipped), navigational equipment, heating coils and facilities, shall be fully functional and in good working order and condition and in every way seaworthy and fit to carry cargo and perform the voyage(s) required under this Charter.

(b) COMPLEMENT. Owner warrants that, during the period described in Paragraph (a) of this Clause, Vessel shall have a full and efficient complement of Master, officers and crew, with adequate training and experience in operating all Vessel's equipment, including, but not limited to, inert gas and crude oil wash systems (if Vessel is so equipped), and that Master and all officers shall possess valid and current certificates/documents issued or approved by the country of Vessel's registry. Owner further warrants the conversational English language proficiency of Master and officer(s) in charge of cargo and bunker oil handling.

(c) COMPLIANCE. Owner warrants that Vessel shall, during the period described in Paragraph (a) of this Clause, be in full compliance with all applicable international conventions, all applicable laws, regulations and/or other requirements of the country of Vessel registry and of the countries of the port(s) and/or place(s) to which Vessel may be ordered hereunder and all applicable regulations and/or requirements of any terminals or facilities in such port(s) or place(s) where Vessel shall load or discharge. Owner further warrants that Vessel shall have on board, during the subject period, all certificates, records or other documents required by the aforesaid conventions, laws, regulations and/or requirements.

(d) BREACH. If any of the warranties stipulated in this Clause are breached, any delay resulting therefrom shall not count as laytime or, if Vessel is on demurrage, as time on demurrage, and any expense attributable to such delay shall be for Owner's account.

(e) SALE. Owner warrants that the Vessel has not been sold, is not on offer to be sold, and will not be offered for sale during the period of this Charter.

3. **CLEANING.**

(a) Owner shall clean the tanks, pipes and pumps of Vessel at its expense to the satisfaction of Charterer's representative(s). If the cargo specified in Part I (F) is clean product and inspection of the tanks is required, Owner shall gasfree the tanks as necessary. Any time used for tank inspection and any re-inerting of Vessel shall count as laytime or, if Vessel is on demurrage, as time on demurrage. Any time required for cleaning and gasfreeing shall not count as laytime or, if Vessel is on demurrage, as time on demurrage. Compliance with this Clause shall not be deemed compliance with Owner's obligations under Clause 2, which are in no way lessened by this Clause.

(b) Vessel shall not be responsible for any admixture, if more than one quality of cargo is shipped, nor for contamination or deterioration in quality of the cargo unless the admixture, contamination or deterioration results from (i) unseaworthiness existing at the inception of loading which was discoverable by the exercise of due diligence or (ii) error or fault of the servants of Owner in the loading, care or discharging of the cargo.

(c) In performing its obligations under this Clause 3, Owner shall comply with the latest ISGOTT guidelines.

4. **VOYAGE(S).**

(a) Vessel shall proceed with utmost dispatch to any port(s) or place(s) as ordered by Charterer in accordance with Part I (C) and there load a cargo as specified in Part I (E) and (F). On completion of loading, Vessel shall then with utmost dispatch proceed to any port(s) or place(s) as ordered by Charterer in accordance with Part I (D) and there deliver said cargo. Except when required by reason of Vessel fault, lightering within port limits shall be at Charterer's expense.

(b) Owner shall timely transmit Charterer's voyage instructions in their entirety to the Vessel for Master's implementation. Owner shall ensure that Charterer is promptly advised of all accidents to, and/or pollutions involving, the Vessel and of any Vessel system failure. Notwithstanding anything contained in this Charter or in the voyage instructions, the Master and Owner shall continue to be fully and solely responsible for the operation, management and navigation of the Vessel throughout the Vessel's service under this Charter.

(c) Owner warrants that, throughout Vessel's service under this Charter, Owner shall have full and valid Protection and Indemnity Insurance ("P&I Insurance") for the Vessel, as described herein, with the P&I Insurance placed with a P&I Club which is a Member of the International Group of P&I Clubs. This P&I Insurance shall be at no cost to Charterer. The P&I Insurance must include full coverage against liability for cargo loss/damage and coverage against liability for pollution for an amount not less than US $1,000 Million (One Billion Dollars) per incident. If requested by Charterer, Owner shall promptly furnish to the Charterer proper evidence of such P&I Insurance upon signing this Charter or at any time during the Charter term. The above warranty is to be regarded as an essential part of this Charter, which is conditional on its truth or performance, so that its breach entitles the Charterer, in Charterer's option, to terminate the Charter and/or to recover any damages allowable in law.

5. **MAXIMUM CARGO.** In no event shall Charterer be required to provide, nor shall Vessel load, a cargo quantity in excess of a Full Cargo. In addition, Charterer shall not be required to provide a cargo quantity in excess of the maximum cargo capacity specified in Part I (A). All time lost and expense incurred by reason of Vessel loading a quantity of cargo which puts Vessel, at any stage of the voyage(s) hereunder, below the marks permissible under the ILL Convention shall be for Owner's sole account.

6. **FREIGHT.**

(a) Freight shall be paid at the rate stipulated in Part I (G) and shall be computed on gross quantity as stated on the Bill of Lading and on quantity of documented tank washings if freight thereon is payable in accordance with Clause 33 (a); provided, however, that no freight shall be payable on any quantity of cargo which puts Vessel, at any stage of the voyage(s) hereunder, below the marks permissible under

the ILL Convention. Deadfreight shall be paid in accordance with Clause 7. Except as provided in Clause 18 (h), no deduction from freight shall be made for water and/or sediment contained in the cargo, nor for any claim Charterer or cargo interests may have against Owner or Vessel arising under this Charter or Bills of Lading issued for the cargo. Payment of freight shall be made by Charterer without discount upon Charterer's receipt of notice of completion of discharge of cargo at last discharging place less any disbursements made to Master or Owner's agent(s) at port(s) or place(s) of loading and/or discharging plus cost of insurance, commissions and expenses on said disbursements and any other costs incurred by Charterer on Owner's behalf pursuant to this Charter. 75 76 77 78 79

(b) WORLDSCALE. Unless otherwise stipulated herein, all rates, hours, terms and conditions in the Worldwide Tanker Nominal Freight Scale current on the date of this Charter (hereinafter called "WORLDSCALE") shall apply to this Charter regardless of when Vessel loads. 80 81 82

(c) If cargo is carried between places and/or by a route for which no rate is expressed in WORLDSCALE, then, in the absence of agreement as to the freight rate, the parties hereto will apply to either of the publishers of WORLDSCALE for a binding determination of an appropriate WORLDSCALE rate. 83 84 85

(d) Regardless of whether or not the freight specified in Part I (G) is lumpsum, for the purposes of Section 4(5) of the Carriage of Goods by Sea Act of the United States, or the corresponding provisions of any international regime that may otherwise apply in accordance with Clause 27, Owner and Charterer agree that the customary freight unit, shipping unit or unit (as the case may be) of the cargo is Metric ton. 86 87 88

(e) Owner shall deduct in favor of Charterer an address commission of one point two five percent (1.25%) from freight, deadfreight, and demurrage payable under this Charter. Owner shall clearly identify such deduction on the freight, deadfreight and/or demurrage invoice. 89 90

7. DEADFREIGHT. Should the entire cargo quantity specified in Part I (E) not be supplied, Master shall give immediate notice to Charterer that such cargo quantity has not been furnished, indicating shortage, and shall then await Charterer's instructions. Should Charterer fail to provide further cargo, Vessel, upon request of Charterer, shall then proceed on its voyage provided that the tanks in which the cargo is loaded are sufficiently filled to put it in a seaworthy condition. If any delay is caused to Vessel by reason of Master waiting for Charterer's instructions as aforesaid, such delay shall count as laytime or, if Vessel is on demurrage, as time on demurrage and any expense incurred by Vessel attributable solely to such delay shall be for Charterer's account. Deadfreight shall be paid at the Base Freight Rate on the shortage (being the difference between the cargo quantity specified in Part I (E) and the quantity loaded as shown on the Bills of Lading) provided such deadfreight charge is fully documented by cable advice from Master or by deadfreight certificate. Charterer shall be credited with any freight on residues earned by Owner in accordance with Clause 33(a)(iii). 91 92 93 94 95 96 97 98 99

8. DEMURRAGE / DEVIATION RATE. The rate for demurrage and/or deviation shall be the fixed dollar figure specified in Part I (J) or the rate derived by determining the applicable rate from the WORLDSCALE Demurrage Table for tonnage specified in Part I (J) and multiplying that rate by the Base Freight Rate. If a Part Cargo Minimum basis is specified in Part I (E) and Charterer exercises its option to load additional cargo, any demurrage and/or deviation shall, nevertheless, remain payable at either the aforesaid fixed dollar rate or at the aforesaid rate based on the tonnage specified in Part I (J), whichever is applicable. The applicable rate under this Clause shall hereinafter be called "Demurrage Rate" or "Deviation Rate" as is appropriate. 100 101 102 103 104

9. LOADING AND DISCHARGING PORT(S) / PLACE(S). 105 106

(a) Charterer shall nominate loading or discharging port(s) and/or place(s) or order Vessel to a destination for orders. If Vessel is ordered to a destination for orders, Charterer shall thereafter nominate loading or discharging port(s) and/or place(s). All such nominations or orders shall be made in sufficient time to avoid delay to Vessel. 107 108 109

(b) CHANGE OF DESTINATION. After nominating loading and/or discharging port(s) or place(s) pursuant to Paragraph (a) of this Clause, Charterer may nominate new port(s) or place(s), whether or not they are within the range of the previously nominated port(s) or place(s) and/or vary the rotation of any nominated port(s) or place(s) and Owner shall issue instructions necessary to make such nomination. It is understood and agreed, however, that the aforesaid option to nominate new loading port(s) or place(s) in different ranges shall lapse on Vessel tendering Notice of Readiness at a nominated loading port or place and that aforesaid option to nominate new discharging port(s) or place(s) in different ranges shall lapse on Vessel tendering Notice of Readiness at a nominated discharging port or place. If a change to, or varying the rotation of, nominated port(s) or place(s) occurs or if Vessel is sent to a destination for orders, any time by which the steaming time to the port(s) or place(s) to which Vessel is finally ordered exceeds that which would have been taken if Vessel had been ordered to proceed to such port(s) or place(s) in the first instance shall be compensated at the Deviation Rate per running day and pro rata for a part thereof. In addition, Charterer shall pay for extra bunkers consumed during such excess time at Owner's documented actual replacement cost at the port where bunkers are next taken. 110 111 112 113 114 115 116 117 118 119

(c) Any order of Vessel to a destination for orders, all nominations and any renominations pursuant to this Clause shall be consistent with Part I (C) and (D). 120 121

10. ESTIMATED TIME OF ARRIVAL (ETA). 122 123

(a) Unless otherwise instructed, the following Estimated Time of Arrival (ETA) notifications shall be given. As soon as commencing the voyage to the nominated loading port(s) or place(s), but in no event later than seventy-two (72) hours prior to the commencement of laydays specified in Part I (B), Master shall advise Charterer and Vessel's agent and terminal of Vessel's estimated date and time of arrival at the nominated loading port(s) or place(s). Further, provided the length of the voyage permits, Master shall confirm or amend such advice seventy-two (72), forty-eight (48) and twenty-four (24) hours prior to Vessel's arrival at the loading port(s) or place(s). On leaving the final loading port or place, Master shall advise Charterer and Vessel's agent of Vessel's estimated date and hour of arrival at the nominated discharging port(s) or place(s). Further, provided the length of the voyage permits, Master shall confirm or amend such advice seventy-two (72), forty-eight (48) and twenty-four (24) hours prior to Vessel's arrival at the discharging port(s) or place(s). In addition, on leaving the final loading port or place, Master shall advise Charterer of expected maximum draft at arrival and, provided the length of voyage permits, shall confirm or amend such advice no later than seventy-two (72) hours prior to Vessel's arrival at the discharging port(s) or place(s). 124 125 126 127 128 129 130 131 132 133

(b) An alteration of more than three (3) hours in the twenty-four (24) hour notice or an alteration of more than twelve (12) hours in any other advice given pursuant to Paragraph (a) of this Clause shall be advised by Master to Charterer and Vessel's agent. 134 135

(c) If, for any reason, Vessel is unable to trim to even keel for arrival at the discharging port(s) or place(s), Master shall give notice of this to Charterer as soon as possible after receiving such loading instructions but no later than sailing from the final loading port or place. Such notice shall include Vessel's estimated arrival draft forward and aft. 136 137 138

(d) If Master fails to comply with the requirements of Paragraphs (a), (b) and/or (c) of this Clause, any delay resulting therefrom at loading and/or discharging port(s) or place(s) shall not count as laytime or, if Vessel is on demurrage, as time on demurrage. 139 140

(e) At each loading and discharging port or place, Master or Vessel's agent shall promptly notify Charterer of the dates and times the following events occurred: 141 142

- Notice of Readiness to load/discharge tendered; 143
- All fast; 144
- Hoses connected; 145
- Hoses disconnected; 146
- All cargo documents on board; and 147
- Vessel sailed. 148

11. NOTICE OF READINESS. Upon arrival at customary anchorage or waiting place at each loading and discharging port or place, Master 149

or Vessel's agent shall give Charterer or its representative notice that Vessel is in all respects ready to load or discharge cargo, berth or **150**
no berth. At each load port or place, the Vessel shall be fully bunkered for the intended voyage and the Notice of Readiness shall, without **151**
limitation, confirm such bunkering. **152**

**12. CANCELLATION OF CHARTER.** If Vessel has not tendered a valid Notice of Readiness ("NOR") by 1600 hours local time on the **153**
Cancelling Date specified in Part I (B) ("Cancelling Date"), Charterer shall have the right to cancel this Charter by notifying Owner or **154**
Owner's agent of such cancellation within forty-eight (48) hours local time after expiration of the said Cancelling Date, failing which this **155**
Charter shall remain in full force and effect; in which case, laytime shall commence no earlier than forty-eight (48) hours after the tender **156**
of NOR or on the commencement of loading, whichever occurs first. Charterer's cancellation option shall continue to apply even if Vessel **157**
tenders NOR within the forty-eight (48) hour period after expiration of the Cancelling Date. However, if Vessel is delayed by reason of **158**
Charterer's change of orders pursuant to Clause 9 and/or ice risks as stipulated in Clause 21, the Cancelling Date shall be extended, **159**
with the option of cancellation as aforesaid, by any time so directly lost. Cancellation or failure to cancel shall be without prejudice to any **160**
claims for damages Charterer may have for late tender of Vessel's services. **161**

**13. LAYTIME / DEMURRAGE.** **162**
**(a) COMMENCEMENT / RESUMPTION.** Laytime or time on demurrage, as herein provided, shall commence or resume upon the **163**
expiration of six (6) hours after receipt by Charterer or its representative of Notice of Readiness or upon Vessel's Arrival in Berth, whichever **164**
occurs first. Laytime shall not commence before 0600 hours local time on the Commencing Date specified in Part I (B) unless Charterer **165**
shall otherwise agree, in which case laytime shall commence upon commencement of loading. **166**
**(b) EARLY LOADING.** In the event Charterer agrees to load Vessel prior to commencement of laydays, laytime will begin at **167**
commencement of loading and the amount of time from commencement of loading until 0600 hours local time on the commencing date **168**
specified in Part I (B), shall be added to the laytime specified in Part I (I). **169**
**(c) DURATION.** The laytime specified in Part I (I) shall be allowed free of expense to Charterer for the purpose of loading and discharging **170**
cargo and all other Charterer's purposes. Laytime or, if Vessel is on demurrage, time on demurrage, shall continue until all cargo hoses **171**
have been completely disconnected upon the final termination of the loading or discharging operation. Disconnection of all cargo hoses **172**
shall be promptly effected. If Vessel is delayed in excess of two (2) hours after such disconnection of cargo hoses solely for Charterer's **173**
purpose, laytime or, if Vessel is on demurrage, time on demurrage shall resume upon the expiration of said two (2)-hour period and shall **174**
continue from that point until the termination of such delay. **175**
**(d) PAYMENT.** Charterer shall pay demurrage per running day and pro rata for a part thereof for all time by which the allowed laytime **176**
specified in Part I (I) is exceeded by the time taken for loading and discharging and for all other Charterer's purposes and which, under **177**
this Charter, counts as laytime or as time on demurrage. **178**

**14. LAYTIME / DEMURRAGE CONSEQUENCES.** **179**
**(a) SPECIFIED.** Any delay to Vessel after the expiration of six (6) hours from Charterer's receipt of Notice of Readiness before Arrival in **180**
Berth or any delay to Vessel after Arrival in Berth, due to unavailability of berth (prior to Arrival in Berth), unavailability of cargo, or solely **181**
for Charterer or terminal purposes, shall count as laytime or, if Vessel is on demurrage, as time on demurrage. **182**
**(b) HALF-RATE DEMURRAGE.** If demurrage is incurred and the Vessel has been delayed in berthing, loading and/or discharging **183**
(hereinafter in this Paragraph (b) called "Delay") due to: weather and/or sea conditions; fire; explosion; strike; picketing; lockout, **184**
slowdown, stoppage or restraint of labor; breakdown of machinery or equipment in or about the facilities of Charterer, supplier, shipper **185**
or consignee of the cargo (hereinafter in this Paragraph (b) separately and jointly called "Listed Conditions"), be the Delay prior to or after **186**
the expiration of laytime, that span of time on demurrage equal to the period or periods of Delay as just described shall be paid at half **187**
of the Demurrage Rate. If, during a period of Delay, Listed Conditions co-existed, along with any of the other conditions described in **188**
Paragraph (a) of this Clause 14, the Listed Conditions shall conclusively be deemed to be sole cause of the Delay, either if they caused **189**
the Delay independently of the other conditions or could have caused the Delay if the other conditions had not so co-existed. Weather **190**
and/or sea conditions shall include, but not be limited to, lightning, restricted visibility (the term "restricted visibility" shall mean any **191**
condition in which visibility is affected by fog, mist, failing snow, ice, heavy rainstorms, sandstorms and any other similar causes), storm, **192**
wind, waves and/or swells. The provisions of Paragraph 14(b) shall apply irrespective of any option given in Part I (C) and (D). The **193**
foregoing provisions as to payment of half the Demurrage Rate in respect to weather and/or sea conditions shall not apply where the **194**
Vessel is lightered or discharged at sea. **195**
**(c) EXCLUSIONS.** Notwithstanding the provisions of any other Paragraph of this Clause or any other Clause of this Charter to the **196**
contrary, time shall not count as laytime or, if Vessel is on demurrage, as time on demurrage, if such time is spent or lost: **197**
      (i) As a result of labor dispute, strike, go slow, work to rule, lockout, stoppage or restraint of labor involving Master, officers or **198**
crew of Vessel or tugboats or pilots unless, in the case where Charterer has load/discharge port options, a labor dispute, strike, go slow, **199**
work to rule, lockout, stoppage or restraint of labor of tug boats or pilots, is in force at the port at the time Charterer nominated such port; **200**
      (ii) On an inward passage, including, but not limited to, awaiting daylight, tide, tugs or pilot, and moving from anchorage or **201**
other waiting place, even if lightering has taken place at the anchorage or other waiting place, until Vessel's Arrival in Berth; **202**
      (iii) Due to overflow, breakdown, inefficiency, repairs, or any other conditions whatsoever attributable to Vessel, Master, **203**
officers, crew and/or Owner, including inability to load or discharge the cargo within the time allowed and/or failure to meet Vessel **204**
warranties stipulated in this Charter; **205**
      (iv) Due to Owner or port authority prohibiting loading or discharging; **206**
      (v) By reason of local law or regulations, action or inaction by local authorities (including, but not limited to, Port, Coast Guard, **207**
Naval, Customs, Immigration and/or Health authorities), with the exception, however, of port closure due to weather and/or sea conditions; **208**
      (vi) In ballasting or deballasting, lining up and/or draining of pumps/pipelines, cleaning of tanks, pumps, pipelines, bunkering **209**
or for any other purposes of the Vessel only, unless same is carried out concurrent with loading and/or discharging so that no loss of **210**
time is involved; or **211**
      (vii) Due to an escape or discharge of cargo and/or pollutant substances (herein after called "pollutants") or the threat of an **212**
escape or discharge of pollutants on or from Vessel. (The phrase "threat of an escape or discharge of pollutants" shall for the purposes **213**
of this paragraph (vii) mean a grave and imminent danger of the escape or discharge of pollutants which, if it occurred, would create a **214**
serious danger of pollution damage). **215**
**(d) OTHER REFERENCES.** Laytime and demurrage references are also contained in the following Clauses: **216**

| Clause: | | | |
|---|---|---|---|
| | 2 (d) | Vessel-Breach | **216** |
| | 3 (a) | Cleaning | **217** |
| | 5 | Maximum Cargo | **218** |
| | 7 | Deadfreight | **219** |
| | 8 | Demurrage/Deviation Rate | **220** |
| | 10 (d) | Estimated Time of Arrival (ETA) | **221** |
| | 13 | Laytime/Demurrage | **222** |
| | 15 (b) and (c) | Lightering/Cargo Advisor | **223** |
| | 16 (c) and (d) | Shifting and Off Berth | **224** |
| | | | **225** |

| 17 (d) | Cargo Measurement | 226 |
| 18 (a) (c) (d) (f) and (g) | Pumping in and Out | 227 |
| 19 | Back Loading | 228 |
| 21 (b) | Ice-At Port | 229 |
| 22 | Dry Cargo | 230 |
| 23 | Quarantine | 231 |
| 24 (b) | Inspection-Bunker Sampling | 232 |
| 25 | Heat | 233 |
| 27 (c) | Bills of Lading | 234 |
| 29 (b) | Exceptions | 235 |
| 33 (a) | Clean Seas-Handling of Tank Washings | 236 |
| 36 | Waiver of Claims | 237 |

(e) UNSPECIFIED. Any delays for which laytime/demurrage consequences are not specifically allocated in this or any other Clause of this Charter and which are beyond the reasonable control of Owner or Charterer shall count as laytime or, if Vessel is on demurrage, as time on demurrage. If demurrage is incurred, on account of such delays, it shall be paid at half the Demurrage Rate. 238 239 240

15.     LIGHTERING / CARGO ADVISOR. 241

(a) Any partial lightering or lightering to extinction, at sea or at a place outside a port, shall be conducted in accordance with the latest OCIMF guidelines for ship-to-ship transfers and with port authority approval, if applicable. The Vessel shall not lighter, either partially or to extinction, as just described, without prior consent or specific request from Charterer. 242 243 244

(b) Where lightering is requested by Owner or required by reason of fault attributable to Vessel, all expense and time related to the lightering shall be for the account of the Owner, irrespective of any consent from Charterer. 245 246

(c) Any lightering, at sea or at a place outside a port, except as described in subparagraph (b), shall be at the expense of Charterer and, notwithstanding Clauses 11, 13 (a) and 14 (a) and (b), time used for such lightering shall count as laytime or as time on demurrage, as provided below: 247 248 249

    (i) If Vessel is partially lightered at sea or at a place outside a port, laytime or, if Vessel is on demurrage, time on demurrage shall commence when Vessel arrives at the lightering site designated by Charterer and shall end when disconnecting of the cargo hoses from the last cargo receiving vessel has been completed. 250 251 252

    (ii) If Vessel is lightered to extinction at sea or at a place outside a port, laytime or, if Vessel is on demurrage, time on demurrage shall commence upon the expiration of six (6) hours after Vessel arrives at the lightering site designated by Charterer or when Vessel is all fast alongside the first cargo receiving vessel, whichever occurs first, and end when disconnection of the cargo hoses from the last cargo receiving vessel has been completed. 253 254 255 256

(d) If Vessel is lightered to extinction at sea, freight payment shall, in the absence of agreement as to the appropriate freight rate, be based on the freight rate stipulated in Part I (G) multiplied by a flat rate which shall be obtained from the Worldscale Association (London) Limited or the Worldscale Association (NYC) Inc. If Vessel is partially lightered at sea, the lightering site shall not constitute a port or place additional to those specified in Part I (D) and the freight rate for the voyage shall be the same as if the lightering had not taken place. Charterer, however, shall reimburse Owner for any time by which the steaming time to the final discharging port or place exceeds that which would have been taken if Vessel had not lightered at the Deviation Rate per day or pro rata for a part thereof. In addition, Charterer shall pay for extra bunkers consumed by Vessel during such excess time at Owner's documented actual replacement cost at the port where bunkers are next taken. 257 258 259 260 261 262 263 264

(e) With respect to any loading or discharging in port or at sea, Charterer may, at its option and cost, place on the Vessel one or more cargo advisors to monitor the loading, lightering and/or discharge of cargo and, if applicable, the inert gas and/or crude oil washing. It is understood and agreed however, that the Master and Owner shall continue to be fully and solely responsible for the operation, management and navigation of Vessel during the entire loading, lightering and/or discharging operation. 265 266 267 268

16.     LOADING / DISCHARGING PLACE. 269

(a) Vessel shall not be required to berth where the maximum draft of Vessel is greater than the depth of water at low tide. In such cases, Charterer undertakes to discharge sufficient cargo into vessels and/or lighters within port limits to enable Vessel to safely reach and lie at berth always afloat. 270 271 272

(b) SAFE LOCATION(S). Charterer shall exercise due diligence to order Vessel to port(s) or place(s) which are safe for Vessel and where it can lie always safely afloat. Notwithstanding anything contained in this or any other Clause in this Charter to the contrary, Charterer shall not be deemed to warrant the safety of any such port(s) or place(s) and shall not be liable for any loss, damage, injury or delay resulting from any unsafe condition at such port(s) or place(s) which could have been avoided by the exercise of reasonable care on the part of the Master or Owner. The term "safe", as used in Part I (C) and (D), shall be construed to be consistent with Charterer's obligation as set forth in this Paragraph (b). 273 274 275 276 277 278

(c) SHIFTING. Charterer shall have the right to shift Vessel within any port of loading and/or discharging from one loading or discharging place back to the same or to another such place once or more often. In the event that Charterer exercises this right, Charterer shall pay all additional expenses properly incurred, including additional Bunkers. Time spent shifting shall count as laytime or, if Vessel is on demurrage, as time on demurrage. For purposes of freight payment, the places grouped in port and terminal combinations in WORLDSCALE are to be considered as berths within a single port, with Charterer paying shifting expenses in accordance with the foregoing. 279 280 281 282 283

(d) OFF BERTH. Charterer or terminal operator shall have the right to shift Vessel from a loading and/or discharging place if Vessel fails to meet the pumping and/or heating warranties stipulated in Clauses 18 and 25 so as to avoid delay to other vessels waiting to use such place. Charterer or terminal operator shall also have the right to shift Vessel from a loading and/or discharging place due to an unsafe condition of Vessel or failure of Vessel to meet the warranties of Clauses 2(a), (b) and/or (c). In such situation(s), Charterer shall not be obliged to provide an alternative loading or discharging place to the place from which Vessel was shifted. However, Charterer shall exercise due diligence to arrange prompt reberthing and commencement of loading or discharging once Vessel has corrected deficiency(ies). All expenses related to this shifting and any reberthing shall be for Owner's account and all time lost by reason of the foregoing shall not count as laytime or, if Vessel is on demurrage, as time on demurrage. An Off Berth reference is also contained in Clause 24 (b). 284 285 286 287 288 289 290 291

17.     CARGO MEASUREMENT. 292 293

(a) Prior to loading, Master shall measure the on board quantities of cargo, water and sediment residues which are segregated in all holding tanks and slop tanks and those which remain in cargo tanks and, if requested, shall advise supplier(s) and Charterer of such quantities. After loading, Master shall determine the cargo quantities loaded, expressing these cargo quantities in barrels at standard temperature (60ºF), using for such calculations the latest Manual of Petroleum Measurement Standards issued by the American Petroleum Institute (API MPMS) or similar standards issued by the American Society for Testing and Materials. A written tank-by-tank ullage report containing all measurements of oil, water and sediment residues on board prior to loading and quantities of cargo loaded shall be prepared and promptly submitted by Master to Charterer. 294 295 296 297 298 299 300

(b) If Master's calculations of cargo loaded (oil, water and sediment residues on board excluded), after applying the Vessel's Experience 301



Factor (VEF), show any deficiency from the Bill of Lading figures, Master shall, if investigation and recalculation verify such deficiency, issue a Letter of Protest to supplier(s) (which should, if practical, be acknowledged) and shall advise Charterer of such deficiency immediately and thereafter shall send a copy of the Letter of Protest to Charterer. Vessel shall have on board sufficient historical information for the calculation of a VEF using the latest edition of the API MPMS. Master shall calculate and apply the VEF as so determined during all loadings.

(c) Prior to discharging, Master shall measure the quantity of each grade of cargo on board, expressing these quantities in barrels at standard temperature (60°F), using the same calculation procedures specified in Paragraph (a) of this Clause. Before and after discharging, Master shall cooperate with shore staff to ascertain discharged quantities. Vessel shall be obliged to discharge all liquid cargo and, if ordered by Charterer, any residues of cargo, water and sediment. Vessel's just-mentioned obligation shall not in any way be qualified or limited by any purported custom of the trade which is based on a stated in-transit loss or which otherwise would excuse Vessel from discharging all liquid cargo and residues.

(d) An inspector may be employed by Charterer at its expense to verify quantities and qualities of cargo and residues on board Vessel at both loading and discharging port(s) and/or place(s). If Vessel is equipped with an Inert Gas System, depressurization of tanks to permit ullage measurements shall be allowed in accordance with the provisions of the most recent Inert Gas Systems for Oil Tankers publication issued by the International Maritime Organization (IMO). Any time used solely for such inspections and/or measurements shall count as laytime or, if Vessel is on demurrage, as time on demurrage.

18. PUMPING IN AND OUT.

(a) Hoses for loading and discharging shall be furnished by Charterer and shall be connected and disconnected by Charterer or by Owner, at Charterer's option. When Vessel loads and/or discharges at sea terminal(s), Vessel shall be properly equipped, at Owner's expense, for operations at such terminal(s), including suitable anchors, ground tackle, mooring lines and equipment for handling submarine hoses. Vessel shall also be properly equipped with a sufficient number of cargo manifold reducing pieces of steel or comparable material (excluding aluminum and gray cast iron) which meet the most recent Oil Companies International Marine Forum (OCIMF) standards, to make available appropriate flanges for cargo hoses/arms at all manifold connections on one side of Vessel. If Vessel is not properly equipped as required in this Paragraph (a), any time thereby lost shall not count as laytime or, if Vessel is on demurrage, as time on demurrage.

(b) The cargo shall be pumped into Vessel at the expense and risk of Charterer only up to Vessel's permanent hose connections. The cargo shall be discharged from Vessel at the expense and risk of Owner only up to Vessel's permanent hose connections. Vessel shall provide all necessary pumps, power, and hands required on board for mooring and unmooring, connecting and disconnecting of hoses and loading and discharging. If requested by Charterer, Vessel shall load and/or discharge more than one grade simultaneously if Vessel is technically capable of doing so.

(c) Owner warrants that Vessel shall arrive at the loading place(s) with cargo tanks properly inerted and that such tanks shall so remain inerted throughout the loading of the cargo, the voyage and the subsequent discharging of the cargo. In case of an Inert Gas System failure during loading and/or discharging, cargo operations shall be suspended immediately until the System becomes fully operational, any deficiency in inerting is fully corrected and the terminal (or other loading and/or discharging facility) has given permission to resume operations. Time used from cessation to resumption of cargo operations shall not count as laytime or, if Vessel is on demurrage, as time on demurrage.

(d) If required by Charterer, Vessel, after loading or discharging, shall clear shore pipelines of cargo by pumping water through them and the time thereby consumed shall count as laytime or, if Vessel is on demurrage, as time on demurrage.

(e) All overtime incurred by officers and crew in loading and/or discharging shall be for the account of Owner.

(f) Vessel shall load at rates requested by Charterer having due regard for the safety of Vessel. Owner warrants that Vessel shall discharge entire cargo (be it one or more grades) within twenty-four (24) hours pumping time or maintain the maximum safe psi pressure at Vessel's rail that the Vessel can discharge at, but always at a minimum of 100 psi, during the entire period of discharge provided shore facilities permit. All time lost as a result of Vessel being unable to discharge its cargo in accordance with the pumping warranty above shall not count as laytime or, if Vessel is on demurrage, as time on demurrage. If the terminal or place of discharging does not allow or permit Vessel to meet the above warranty or requires discharging grades consecutively, Master shall forthwith issue a Letter of Protest (which should, if practical, be acknowledged) to such terminal or place and shall immediately advise Charterer. If Master fails to issue the Letter of Protest, Owner shall be deemed to waive any rights to contest that time was lost as a result of Vessel's failure to comply with the above pumping warranty. Any pumping time lost solely due to restrictions imposed by the terminal or place of discharging shall count as laytime or, if Vessel is on demurrage, as time on demurrage.

(g) Charterer shall have the right to require Vessel, if it is so equipped, to Crude Oil Wash the cargo tanks and, in such case, the allowed pumping hours (i.e. the twenty-four (24) hours of pumping time specified in Paragraph (f) of this Clause or the number of pumping hours taken to discharge the entire cargo when Vessel maintains the applicable rail pressure in accordance with Paragraph (f) of this Clause, whichever is applicable) shall be increased by the maximum hours specified in Part I (A) for Crude Oil Wash operations. If less than all of the tanks are washed, the said maximum hours shall be prorated on the basis of the number of tanks washed to the total number of cargo tanks and the hours resulting from such proration shall be added to the allowed pumping hours. If Crude Oil Wash is not conducted, Charterer shall have the right to require Vessel to remain at berth for clingage rundown or other cargo recovery technique. The time for such clingage rundown or other cargo recovery technique shall not exceed ten (10) hours and the time so used shall count as laytime or, if Vessel is on demurrage, as time on demurrage.

(h) In the event that any liquid cargo remains on board at completion of discharge for the final voyage under this Charter, then Charterer shall have the right to deduct from freight an amount equal to the Free On Board (FOB) port of loading value of such cargo plus freight due with respect thereto. The quantity and quality of such liquid hydrocarbon material shall be determined by a mutually agreeable independent cargo inspector. The quantity of Remaining On Board (ROB) material shall be measured using the Vessel's wedge tables, if available, or otherwise by wedge formula.

19. BACK LOADING. Charterer shall have the option of loading Vessel with a part cargo at any discharging port or place to which Vessel may have been ordered, provided that such part cargo is as described in Part I (F) and is compatible with cargo then on board. Owner shall discharge such part cargo at any other discharging port(s) or place(s) previously nominated, provided such port(s) or place(s) lie within the rotation of the discharging ports or places previously nominated. If this option is exercised, additional time consumed awaiting berth and/or cargo and/or tank preparation and/or loading and discharging such part cargo shall count as laytime or, if Vessel is on demurrage, as time on demurrage. Any additional expenses, including port charges, incurred as sole result of loading and discharging such part cargo shall be for Charterer's account.

20. DUES, TAXES AND OTHER CHARGES.

(a) Unless otherwise specified in WORLDSCALE and to the extent not prohibited by law, dues, taxes and other charges upon Vessel (including those assessed on the quantity of cargo loaded or discharged or on the freight) shall be paid by Owner and dues, taxes and other charges on the cargo shall be paid by Charterer. Vessel shall be free of charges for the use of any place(s) arranged by Charterer solely for the purpose of loading or discharging cargo. However, Owner shall be responsible for charges for any such place(s) when used solely for Vessel's purposes, such as, but not limited to, awaiting Owner's orders, tank cleaning, repairs, before, during or after loading

and/or discharging. 378

(b) Notwithstanding the provisions of Clause 20(a), dockage and wharfage shall be deemed included in the freight rate specified in Part I (G). 379

**21. ICE.** 380

(a) **DURING VOYAGE**. In case a nominated port or place of loading or discharging should be inaccessible due to ice, Master shall immediately notify Charterer, requesting revised orders and shall remain safely outside the ice-bound area. Charterer shall give orders for another port or place which is free from ice and where there are facilities for the loading or discharging of the cargo in bulk. In this event, freight shall be paid at the rate stipulated in Part I (G) from or to such alternate port or place and any time by which the steaming time from or to such port or place exceeds that which would have been taken if the Vessel had been ordered to proceed from or to such port or place in the first instance shall be compensated at the Deviation Rate per running day and pro rata thereof. In addition, Charterer shall pay for extra bunkers consumed during such excess time at Owner's documented actual replacement cost for such bunkers at the port where bunkers are next taken. 381
382
383
384
385
386
387
388

(b) **AT PORT**. If, on or after Vessel's arrival at the loading or discharging port or place, it is dangerous to remain at such port or place for fear of Vessel being frozen-in or damaged, Master shall notify Charterer who shall give orders for Vessel either to proceed to another port or place where there is no danger of ice and where there are facilities for the loading or discharging of the cargo in bulk or to remain at such original port or place at Charterer's risk. If Vessel is ordered to proceed to another port or place, the sum in respect of freight and delay to be paid by Charterer shall be as stipulated in Paragraph (a) of this Clause. If Vessel remains at such original port or place, any time so lost on account of ice shall count as laytime or, if Vessel is on demurrage, as time on demurrage. 389
390
391
392
393

**22. DRY CARGO**. Charterer has the option of shipping packaged and/or general cargo (including oils and bitumen in drums) in the available dry cargo space. Freight shall be payable on such cargo in accordance with Clause 6 at the Base Freight Rate and Charterer shall pay, in addition, all expenses, including port dues, incurred solely as a result of the packaged and/or general cargo being carried. The time used loading and discharging such dry cargo shall count as laytime or, if Vessel is on demurrage, as time on demurrage, but only to the extent that such time is not concurrent with time used loading and/or discharging the liquid cargo carried hereunder. 394
395
396
397
398
399

**23. QUARANTINE**. Time lost at any port or place due to quarantine shall not count as laytime or, if Vessel is on demurrage, as time on demurrage unless such quarantine was in force at the time when such port or place was nominated by Charterer. 400
401

**24. INSPECTION.** 402

(a) **OPERATIONS/INCIDENTS**. Charterer's representative(s) shall have the right at loading and/or discharging port(s) or place(s) to inspect Vessel and observe operations. Charterer's representatives shall also have the right to attend on board the Vessel to ascertain the circumstances of any incident involving cargo carried hereunder. Owner shall instruct Master to give every assistance so as to enable said representative(s) to properly observe operations throughout Vessel and to ascertain any incident circumstances. 403
404
405
406

(b) **BUNKER SAMPLING**. Charterer's representative(s) shall have the right to survey and take samples of all Vessel's bunker tanks and non-cargo spaces. Refusal by Master to permit such bunker surveying and sampling shall give Charterer or terminal operator the right to order Vessel off berth. All time lost by reason of such refusal, including any time used in shifting Vessel off and back to berth, shall not count as laytime or, if Vessel is on demurrage, as time on demurrage. Further, all expenses related to such refusal, including Vessel shifting expenses, shall be for Owner's account. Any delay to Vessel caused solely by bunker surveying and sampling shall count as laytime or, if Vessel is on demurrage, as time on demurrage. 407
408
409
410
411
412

**25. HEAT**. If Vessel is described as coiled in Part I (A), Owner warrants that Vessel is capable of heating the cargo up to and maintaining it at a maximum temperature of 135°F/57°C. However, unless otherwise requested by Charterer, Vessel shall only be required to maintain the cargo at the temperature loaded (up to a maximum of 135°F/57°C) throughout the voyage and the entire discharge. If requested by Charterer and if the length of the voyage allows, Vessel shall increase and maintain the temperature of the cargo from the loaded temperature to a temperature specified by Charterer, up to a maximum of 135°F/57°C, and Charterer shall pay for extra bunkers consumed solely in increasing the temperature as aforesaid at Owner's documented actual replacement cost for such bunkers at the port where bunkers are next taken. If Vessel fails to maintain the loaded temperature or to increase and maintain the temperature of the cargo, as requested by Charterer, Charterer shall have the option to hold Vessel off berth and/or to suspend discharging, all until the cargo is properly heated, all time and expense in connection with the foregoing being for Owner's account. 413
414
415
416
417
418
419
420

**26. BUNKERS**. When, in connection with the performance of any voyage provided for in this Charter, Owner plans to purchase bunkers at any port(s) outside the United States or its territories, Owner shall purchase the bunkers from Charterer or its designated Affiliate(s) whenever they are so available at competitive prices. In the event lower prices are quoted to Owner by any supplier at the port(s) in question, Owner shall give Charterer or its designated Affiliate(s) the opportunity to meet such quotation. 421
422
423
424

**27. BILLS OF LADING.** 425

(a) Bills of Lading shall be signed by Master as presented, Master attending daily, if required, at the offices of Charterer or its agents. However, at Charterer's option, Charterer or its agents may sign Bills of Lading on behalf of Master. All Bills of Lading shall be without prejudice to this Charter and Charterer shall indemnify Owner against all consequences or liabilities which may arise from any inconsistency between this Charter and any Bills of Lading or other documents signed by Charterer or its agents or by Master at their request or which may arise from an irregularity in papers supplied by Charterer or its agents. 426
427
428
429
430
431

(b) Notwithstanding anything in this Charter to the contrary, the carriage of cargo under this Charter and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vi) of this Clause and such terms shall be incorporated verbatim or be deemed incorporated by reference in any such Bill of Lading. In such sub-paragraphs and in any Act referred to therein, the word "Carrier" shall include Owner and Chartered Owner of Vessel. 432
433
434
435

(i) **CLAUSE PARAMOUNT**. This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to: (i) the International Convention for the Unification of certain Rules relating to Bills of Lading at Brussels, August 1924 ("Hague Rules"), or (ii) the Hague Rules as amended by the Protocol signed at Brussels, February 1968 ("Hague/Visby Rules"), or (iii) the United Nations Convention on the Carriage of Goods by Sea 1978 ("Hamburg Rules"), then this Bill of Lading shall have effect subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading is repugnant to the Act to any extent, such term shall be void to that extent but no further. 436
437
438
439
440
441
442
443
444

(ii) **JASON CLAUSE**. In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Carrier in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Carrier or his Agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo shippers, consignees or owners of the cargo to the Carrier before delivery. 445
446
447
448
449
450
451
452

(iii) **GENERAL AVERAGE**. General Average shall be adjusted, stated, and settled according to the York Antwerp Rules 2004 453

("Rules") and, as to matters not provided for by those Rules, according to the laws and usages at the port of New York; provided that, when there is an actual escape or release of oil or pollutant substances from the Vessel (irrespective of Vessel location), the cost of any measures, continued or undertaken on that account, to prevent or minimize pollution or environmental damage shall not be allowable in General Average; and, provided further, that any payment for pollution damage (as defined in Article I 6.(a) of the 1992 Protocol to the International Convention on Civil Liability for Oil Pollution Damage) shall also not be allowable in General Average. It is understood and agreed, however, that the cost of measures to prevent pollution or environmental damage, undertaken in respect of oil or pollutant substances which have not escaped or been released from the Vessel, shall be included in General Average to the extent permitted by the Rules. If a General Average statement is required, it shall be prepared at such port by an Adjuster from the port of New York appointed by the Carrier and approved by Charterer of Vessel. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges. General Average Agreements and/or security shall be furnished by Carrier and/or Charterer, and/or Owner, and/or Consignee of cargo, if requested. Any cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and be held by the Adjuster at the Adjuster's risk in a special account in a duly authorized and licensed bank at the place where the General Average statement is prepared. 454–466

(iv) BOTH TO BLAME. If Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of Vessel, the owners of the cargo carried hereunder shall indemnify the Carrier against all loss or liability to the other or non-carrying ship or its owners insofar as such loss or liability represents loss of or damage to or any claim whatsoever of the owners of said cargo, paid or payable by the other or recovered by the other or non-carrying ship or its owners as part of their claim against the carrying ship or Carrier. The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact. The provisions in this subparagraph (iv) shall only apply if the Owner shall have exercised due diligence to make the Vessel seaworthy, and properly manned, equipped, and supplied, with the burden of proof in this regard resting solely on Owner. 467–475

(v) LIMITATION OF LIABILITY. Any provision of this Charter to the contrary notwithstanding, the Carrier shall have the benefit of all limitations of, and exemptions from, liability accorded to owner or chartered owner of vessels by any statute or rule of law for the time being in effect. 476–478

(vi) DEVIATION. Vessel shall have liberty to sail with or without pilots, to tow or be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage. 479–481

(c) Except as provided in Paragraph (d) of this Clause, Owner and Vessel shall not be required to deliver cargo at a discharging port or place nominated by Charterer unless the party claiming right to such delivery shall first surrender to Vessel at such port or place one of the original Bills of Lading issued for the cargo, duly endorsed; provided however that, if the Bills of Lading name specific port(s) or place(s) of discharging and the nominated port or place is different or if the Bills of Lading provide for discharge at port(s) or place(s) as ordered, Owner and Vessel shall not be required to deliver the cargo unless the party claiming right to such delivery first surrenders to Vessel all the original Bills of Lading, duly endorsed. The foregoing shall apply even in the situation where one but not all of the original Bills of Lading have been placed on board Vessel at loading but, in such case, only the original Bill(s) of Lading not on board Vessel need first to be surrendered to Vessel in accordance with the foregoing requirements. Any delay to Vessel at the nominated port or place due to the unavailability at such port or place of original Bill(s) of Lading and/or the failure to timely surrender such Bill(s) of Lading to Vessel in accordance with the foregoing requirements shall count as laytime or, if Vessel is on demurrage, as time on demurrage. 482–491

(d) If original Bill(s) of Lading are not available at the discharging port or place for timely surrender to Vessel as provided in Paragraph (c) of this Clause, Vessel shall deliver the cargo to a party and at a facility at the discharging port or place as directed by Charterer in writing, if Charterer first executes a written indemnity in connection with such delivery in favor of Owner, Vessel, any Chartered Owner(s) of Vessel, Master, Vessel operators, agents and underwriters and delivers such indemnity to Owner or Owner's designee. The subject indemnity shall meet the requirements of Paragraph (e) of this Clause, and shall be limited in value to 200 per cent of the CIF value of the cargo. 492–496

(e) The indemnity referred to in Paragraph (d) of this Clause shall be a short form indemnity document incorporating the terms and conditions set forth in Clause 27(f) of this Charter. This document (which must be properly filled in) shall be given to Owner by telex, electronic mail, letter or facsimile as requested by Owner and be in the exact form quoted below, which document, when transmitted, shall be deemed to have been signed by person acting on behalf of Charterer. 497–501

"VOYAGE CHARTER OF _____ 502–503

DATED _____ 504–505

BETWEEN _____, AS OWNER 506–507
AND
_____, AS CHARTERER 508–509

Reference is made to the cargo ('Cargo') now laden aboard the above Vessel ('Vessel'). Pursuant to Clause 27(e) of the above captioned Charter ('Charter'), the undersigned requests that Owner(s) of the Vessel deliver the Cargo at _____ unto _____ without prior discharge site presentation to the Vessel of all original bills of lading issued for the Cargo appropriately endorsed for such delivery and/or at a discharge port or site other than one specifically named in said bills of lading. 510–514

In consideration of such delivery, the undersigned hereby gives an indemnity containing the terms and conditions set forth in Clause 27(f) of the Charter ('Indemnity Terms And Conditions'). The Indemnity Terms And Conditions are deemed incorporated in and made a part of this document. The term 'Indemnifier' in the Indemnity Terms And Conditions shall be deemed to refer to the undersigned. The term 'Cargo' and the phrase 'Requested Delivery' in the Indemnity Terms And Conditions shall be deemed to, respectively, mean the Cargo and the delivery request set forth in the preceding paragraph of this document. The term 'Ship' as used in the Indemnity Terms And Conditions shall be deemed to refer to the Vessel. Print the following information: 515–521

Name of Charterer _____ 522–523

Name of Person Acting on Behalf of Charterer _____ 524–525

Authority/Title of Above Person _____ 526–527

Date Indemnity Given _____ " 528–529

(f) Indemnity Terms and Conditions.

"1. Indemnifier shall indemnify and hold harmless the Owner of the Ship, any chartered Owner of the Ship, the Ship operator, the Ship Master, the Ship underwriters and the Ship agents (hereinafter jointly and individually called 'Indemnitees') in respect of any liability, loss, damage, costs (including, but not limited, to Attorney/Client costs) and other expense of whatever nature which the Indemnitees may sustain or incur by reason of the Requested Delivery.

2. In the event of any legal action or proceedings being commenced against the Indemnitees in connection with the Requested Delivery, Indemnifier shall provide Indemnitees from time to time, on the Indemnitees' demand, with sufficient funds to defend same.

3. If the Ship or any other vessel or other property belonging to the Indemnitees should be arrested or detained or if the arrest or detention thereof should be threatened for any claim in connection with the Requested Delivery, the Indemnifier shall provide, upon demand of the Indemnitees, such bail or other security as may be required to prevent such arrest(s) or detention(s) or to secure the release of the Ship or such vessel or other property from arrest or detention, and shall indemnify and hold harmless the Indemnitees against and from any loss, damage, costs (including but not limited to Attorney/Client costs) and other expense resulting from such arrest or detention or threatened arrest or detention, whether or not same may be justified and to pay to the Indemnitees, on the Indemnitees' demand, the amount of such loss, damages, costs and/or expense.

4. This Indemnity shall automatically become null and void, and Charterer's liability hereunder shall cease, upon presentation of all original Bills of Lading duly endorsed to reflect delivery of Cargo in accordance with the Requested Delivery, or upon the expiration of 36 months after completion of discharge, whichever occurs first; provided that no legal proceedings arising from delivery of the Cargo in accordance with the Requested Delivery have been instituted against the Indemnitees and/or Vessel within such 36-month period. Owner shall advise Charterer with reasonable dispatch in writing if any proceedings are instituted.

5. The within Indemnity shall be governed and construed in accordance with the internal substantive laws of the State of New York, USA. The Indemnitees may, but shall not be obligated to, bring any legal action or proceeding with respect to such Indemnity in the Courts of the State of New York, USA or in the U.S. Federal Court situated therein and the Indemnifier unconditionally and generally accepts in regard to such legal action or proceeding for itself and its property, the jurisdiction and venue of the aforesaid courts."

28.  WAR.

(a) No contraband of war shall be shipped, but petroleum and/or its products shall not be deemed contraband of war for the purposes of this Clause. Vessel shall not, however, be required, without the consent of Owner, which shall not be unreasonably withheld, to enter any port, place, or zone which is involved in a state of war, warlike operations or hostilities, civil strife, terrorism and other politically or religiously motivated activities, or piracy, whether there be a declaration of war or not, where it might reasonably be expected to be subject to capture, seizure or arrest, or to a hostile act by a belligerent power (the term "power" meaning any de jure or de facto authority or any other purported governmental organization maintaining naval, military or air forces or any terrorist group or organization).

(b) For the purposes of this Clause, it shall be unreasonable for Owner to withhold consent to any voyage, route, or port or place of loading or discharging if insurance against all risks defined in Paragraph (a) of this Clause is then available commercially or under a government program in respect of such voyage, route or port/place of loading or discharging. If such consent is given by Owner, Charterer shall pay any provable additional cost of insuring Vessel against Hull war risks over and above such costs in effect on the date of this Charter in an amount equal to the insured value stipulated in its ordinary marine policy as of the date of this Charter. If such insurance is not obtainable commercially or through a government program, Vessel shall not be required to enter or remain at any such port, place or zone and, in such case, Charterer shall have the right to order Vessel to load or discharge, as the case may be, at any other port(s) or place(s) consistent with Part I (C) and (D).

(c) In the event of the existence of the conditions described in Paragraph (a) of this Clause subsequent to the date of this Charter, Charterer shall, in respect of a voyage to any such port, place or zone, assume any provable additional cost of wages and insurance properly incurred in connection with Master, officers and crew as a consequence of such war, warlike operations or hostilities over and above such costs in effect on the date of this Charter.

29.  EXCEPTIONS.

(a) Vessel, Master and Owner shall not, unless otherwise expressly provided in this Charter, be responsible for any loss or damage to cargo arising or resulting from: any act, neglect, default or barratry of Master, pilots, mariners or other servants of Owner in the navigation or management of Vessel; fire, unless caused by the personal design or neglect of Owner; collision, stranding, or peril, danger or accident of the sea or other navigable waters; or from explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery. Neither Vessel, Master or Owner, nor Charterer, shall, unless otherwise expressly provided in this Charter, be responsible for any loss or damage or delay or failure in performing hereunder arising or resulting from: act of God; act of war; perils of the sea; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people, or seizure under legal process provided bond is promptly furnished to release Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

(b) The exceptions stated in Paragraph (a) of this Clause shall not affect Owner's warranties and undertakings herein with respect to the condition of Vessel, the obligations of Owner in respect of the loading, handling, stowage, carriage, custody, care and discharge of the cargo and/or the rights or obligations of either Owner or Charterer with respect to laytime or demurrage as elsewhere provided in this Charter.

30.  LIEN. Owner shall have a lien on all cargoes and subfreights for all amounts due under this Charter, and Charterer shall have a lien on Vessel for all monies paid in advance and not earned, and all disbursements for Owner's account, including commissions, cost of insurance and expenses thereon and for any damages sustained by Charterer as a result of the breach of this Charter by Owner.

31.  AGENTS. Unless otherwise agreed, Charterer shall nominate Vessel's agents at all port(s) and place(s). Such agents shall be appointed, instructed and paid for by Owner and represent solely the Owner and Vessel.

32.  ASSIGNMENT / SUBLET. Charterer shall have the option of assigning this Charter or subletting Vessel, but in either case, Charterer shall always remain responsible for the due fulfillment of this Charter in all terms and conditions.

33.  CLEAN SEAS.

(a) HANDLING OF TANK WASHINGS. Owner agrees to participate in Charterer's program covering oil pollution avoidance. Such Program requires compliance with latest IMO and Port State regulations. The Program prohibits discharge overboard of all oil and all oily water, oily ballast or cargo in any form unless in compliance with IMO and Port State local regulations or under extreme circumstances whereby the safety of Vessel, cargo or life at sea would be imperiled. Owner shall ensure that Vessel's personnel comply with the following:

(i) Subsequent to the date of this Charter and in the course of the ballast passage before presenting for loading hereunder, any oily residues remaining in Vessel from its previous cargoes shall be retained on board and shall be handled according to Charterer's instructions.

(ii) During tank washing, the tank washings shall be collected into one cargo compartment and, after maximum separation of free water, such free water shall be discharged overboard to the extent permitted by applicable international regulations.

(iii) Thereafter, Charterer shall be notified promptly of the estimated quantity of the segregated tank washings and the type and source of such washings. If Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be obtained by Owner and paid for by Charterer. Any additional Canal dues incurred on the ballast passage by reason of Vessel having tank

530
531
532
533
534
535
536
537
538
539
540
541
542
543
544
545
546
547
548
549
550
551
552
553
554
555
556
557
558
559
560
561
562
563
564
565
566
567
568
569
570
571
572
573
574
575
576
577
578
579
580
581
582
583
584
585
586
587
588
589
590
591
592
593
594
595
596
597
598
599
600
601
602
603
604
605

Sept 27 2005   This electronic version is for reference only

washings on board shall be for the sole account of Owner. Owner shall ensure that Master, on Vessel's arrival at the loading port(s) or place(s), does the following:

* arranges for the measurement of the segregated tank washings in conjunction with the cargo supplier(s);
* records the quantity of tank washings so measured in Vessel's ullage record;
* issues a Slop Certificate; and
* arranges that the Slop Certificate and/or Vessel's ullage record be duly signed by the cargo supplier(s) and promptly sent to Charterer.

The segregated tank washings and any other oily residues on board (hereinafter called "residues") shall, at Charterer's option, be pumped ashore into slop facilities at the loading port(s) or place(s), commingled with the cargo to be loaded or segregated from the cargo to be loaded.

If Charterer requires Master to discharge the residues at facilities at loading port(s) or place(s), no freight shall be payable on same but the time involved in accomplishing such discharge shall count as laytime or, if Vessel is on demurrage, as time on demurrage, including, but not limited to, waiting for availability of, or for berthing at, the slop receiving facility and shifting to and from such facility. Further, the cost of such facilities and the ultimate disposal of the residues shall be for Charterer's sole account. If Charterer requires residues to be kept separate from the cargo to be loaded, same shall, at Charterer's option, be discharged at the discharging port(s) or place(s) in accordance with Charterer's instructions.

If Charterer requires that the cargo be loaded on top of residues or that such residues be kept separate from the cargo to be loaded, in either case freight shall be payable in accordance with Clause 6 on the quantity of residues at the Overage Rate, if such rate exists, or otherwise at the Base Freight Rate, up to a maximum tonnage equivalent to one percent (1.0%) of Vessel's deadweight as specified in Part I (A), with the exception that, in the case of a Part Cargo Minimum, no freight shall be paid if the residues are kept separate and not discharged. In no event shall Charterer hold any liability for deadfreight in connection with residues, except where the Vessel is ordered to load a full cargo and is required to keep residues segregated, in which case deadfreight shall be due. Nothing in Charterer's instruction shall be construed as permission to contravene any applicable laws or regulations by the discharging of oily residues.

(b) **CLEAN BALLAST.** Owner warrants that Vessel will arrive at load port(s) with clean ballast.

(c) **ITOPF.** Owner warrants that it is a Member of the International Tanker Owners Pollution Federation ("ITOPF") and that Owner will retain such membership during the entire period of the services of the Vessel under this Charter.

34.   **DRUG AND ALCOHOL POLICY.** Owner warrants that it has a policy on Drug and Alcohol Abuse ("Policy") applicable to the Vessel which meets or exceeds the standards in the Oil Companies International Marine Forum Guidelines For the Control of Drugs and Alcohol Onboard Ship. Under the Policy, alcohol impairment shall be defined as a blood alcohol content of 40 mg/100 ml or greater; the appropriate seafarers to be tested shall be all Vessel officers and the drug/alcohol testing and screening shall include unannounced testing in addition to routine medical examinations. An objective of the Policy should be that the frequency of the unannounced testing is adequate to act as an effective abuse deterrent, and that all officers be tested at least once a year through a combined program of unannounced testing and routine medical examinations. Owner further warrants that the Policy will remain in effect during the term of this Charter and that Owner shall exercise due diligence to ensure that the Policy is complied with. It is understood that an actual impairment or any test finding of impairment shall not in and of itself mean the Owner has failed to exercise due diligence.

35.   **ARBITRATION.**

(a) Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York, pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by Owner, one by Charterer and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Until such time as the arbitrators finally close the hearings either party shall have the right by written·notice served on the arbitrators and on the other party to specify further disputes or differences under this Charter for hearing and determination. The arbitrators may grant any relief which they, or a majority of them, deem just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance. Awards made in pursuance to this Clause may include costs, including a reasonable allowance for attorney's fees, and judgment may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

(b) Where cargo carried pursuant to this Charter is owned by an Affiliate, any claim related to the carriage of such cargo hereunder shall be subject to this Clause 35, said Affiliate having authorized Charterer to so agree on Affiliate's behalf. If this subparagraph (b) applies, the term "Charterer" in subparagraph (a) of this Clause 35 shall be taken to mean the aforementioned Affiliate.

36.   **WAIVER OF CLAIMS.** Any claim for freight, deadfreight, demurrage and/or charges or expenses under this Charter shall be deemed waived, extinguished and absolutely barred if such claim is not received by Charterer or Owner, as the case may be, in writing with supporting documentation within 90 days from the date of final discharge of the cargo on the voyage with respect to which said claim arises. This Clause shall not apply with respect to claims for damage, loss or shortage of cargo.

37.   **BUSINESS POLICY.** Owner agrees to comply with all laws and lawful regulations carried out in the name, or otherwise on behalf, of Charterer under the provisions of this Charter. Owner agrees that all financial settlements, billings and reports rendered by Owner to Charterer, as provided for in this Charter, shall, in reasonable detail, accurately and fairly reflect the facts about all activities and transactions handled for the account of Charterer.

38.   **INTERPRETATION.** The interpretation of this Charter and the rights and obligations of the parties thereto shall be governed by the Federal Maritime Law of the United States and where applicable by the Law of the State of New York, without taking into consideration any conflict of laws principles. The heading of Clauses and Paragraphs are for convenience of reference only and shall not affect the interpretation of this Charter. No modification, waiver or discharge of any term of this Charter shall be valid unless in writing and signed by the party to be charged therewith. Notwithstanding anything in this Charter to the contrary, this Charter shall not be interpreted or applied so as to require Owner or Charterer to do, or to refrain from doing, anything which would constitute a violation of, or result in a loss of economic benefit under, United States anti-boycott laws and regulations.

39.   **CHARTER ADMINISTRATION.** All Charter terms and conditions finally agreed to by the parties thereto shall be evidenced by a fixture confirmation notice approved by Owner and Charterer. Charterer shall cause the fixture confirmation notice to be transmitted to both Owner and Charterer and each party shall give approval of the fixture confirmation notice one to the other no later than three (3) business days after transmission of the notice. Failure of either party to respond within the said three (3) days shall be conclusively deemed to constitute that party's unqualified acceptance of the fixture confirmation notice. Except as requested in writing by either Owner or Charterer, there shall be no formal written and signed Charter Party.

# INDEX OF CLAUSES

## PART I

(A) VESSEL DESCRIPTION AND POSITION
(B) LAYDAYS
(C) LOADING RANGE(S) / PORT(S) / PLACES(S)
(D) DISCHARGING RANGE(S) / PORT(S) / PLACE(S)
(E) CARGO QUANTITY
(F) CARGO DESCRIPTION
(G) FREIGHT RATE
(H) BILLING
(I) LAYTIME
(J) DEMURRAGE / DEVIATION PER DAY
(K) SPECIAL PROVISIONS
(L) INCORPORATED CLAUSE(S)

## PART II

1. DEFINITIONS
2. VESSEL
3. CLEANING
4. VOYAGE(S)
5. MAXIMUM CARGO
6. FREIGHT
7. DEADFREIGHT
8. DEMURRAGE / DEVIATION RATE
9. LOADING AND DISCHARGING PORT(S) / PLACE(S)
10. ESTIMATED TIME OF ARRIVAL (ETA)
11. NOTICE OF READINESS
12. CANCELLATION OF CHARTER
13. LAYTIME / DEMURRAGE
14. LAYTIME / DEMURRAGE CONSEQUENCES
15. LIGHTERING / CARGO ADVISOR
16. LOADING / DISCHARGING PLACE
17. CARGO MEASUREMENT
18. PUMPING IN AND OUT
19. BACK LOADING
20. DUES, TAXES AND OTHER CHARGES

21. ICE
22. DRY CARGO
23. QUARANTINE
24. INSPECTION
25. HEAT
26. BUNKERS
27. BILLS OF LADING
28. WAR
29. EXCEPTIONS
30. LIEN
31. AGENTS
32. ASSIGNMENT / SUBLET
33. CLEAN SEAS
34. DRUG AND ALCOHOL POLICY
35. ARBITRATION
36. WAIVER OF CLAIMS
37. BUSINESS POLICY
38. INTERPRETATION
39. CHARTER ADMINISTRATION

# ExxonMobil VOY2005

## SPECIAL CLAUSES

1. AFFILIATE ASSIGNMENT
2. AG
3. BONIFACIO STRAITS
4. CARGO OPERATIONS CLAUSE
5. EFFICIENT DEMURRAGE CLAIM PROCESSING (JULY 1, 2002)
6. FLORIDA STRAIT TRANSIT
7. HEIGHT OF MANIFOLD (AUGUSTA / BAYTOWN / WHANGAREI)
8. ITF CLAUSE
9. MESSINA STRAITS
10. NORTH SEA PILOT/SPECIFIC GUIDES
11. PORT STANVAC CLAUSE
12. ROTTERDAM HARBOR DUES
13. SECURITY REGULATIONS (JUNE 10, 2004)
14. SPEED UP
15. STORAGE
16. TURKISH STRAITS
17. U.S. GULF LIGHTERING WARRANTIES (Vers. 2005-1)
18. VESSEL EXPERIENCE FACTOR (ARZEW / MEXICO)
19. VGO CLEANING

## OUTCHARTERS / CO-LOADS *

20. ASSIGNMENT (OUTCHARTERS) *
21. BILL OF LADING / INDEMNITY  (OUTCHARTERS) *
22. CARGO LOSS  ALLOCATION CLAUSE  (CO-LOADS) *
23. INTERPRETATION CLAUSE  (OUTCHARTERS) *
24. LAYTIME ACCOUNTING  (CO-LOADS) *
25. LIGHTERING CLAUSE (OUTCHARTERS) *

# 1. AFFILIATE ASSIGNMENT

**INCHARTERS:**  "Notwithstanding any other provisions of this Charter Party, Charterer may assign all of its rights and delegate obligations under this Charter Party to any affiliate (The term "affiliate" shall mean any company which is directly or indirectly owned or controlled, in whole or in part by Exxon Mobil Corporation)."

## 2. AG

A.  As used in this Clause, the phrase "war events" shall mean war, war-like operations of hostilities, civil strife, revolution and/or piracy, whether there be a declaration of war or not.

B.  If, after the Vessel has tendered notice of readiness at the load port (or if a multi-port load at the first load port) nominated by Charterer hereunder, or after passing Latitude 24 Degrees North inwards, the Vessel is unable to load due to the unavailability of the cargo, the inability of the Vessel to berth, the inability of the loading facility to deliver the cargo and/or any other event of the like or different kind, directly or indirectly caused by the happening of war events (before or after the tender of notice of readiness), Charterer shall not be obligated to nominate another port and shall have the option to cancel this Charter upon telex notice to Owner ("telex"), the effective date of Charter cancellation to be the date of the telex ("effective date").  If Charterer exercises this option, the sole liability of Charterer to Owner with respect to the cancellation or otherwise under the Charter shall be to pay Owner an amount equal to the demurrage for all time used from passing Latitude 24 Degrees North inwards until theoretical time of passing 24 Degrees Parallel Southbound at full speed plus the cost of steaming bunkers consumed, the provable and documented port charges incurred by Vessel under this Clause and any provable and documented additional cost of hull insurance, crew wages and insurance incurred by Owner as described in Clause 28.

C.  Upon sailing load port Vessel to proceed at full speed until arrival Latitude 25 Degrees North and proceed at Charter Party speed.

D.  Owner shall have the right to delay entry into or exit from the Arabian Gulf in case of war event in the Arabian Gulf South of latitude 20 degrees 30 minutes North in the Arabian Gulf.  Any delay by reason of the foregoing shall not count as laytime, or if the Vessel is on demurrage, as demurrage.

Additional bunkers consumed in speeding up Vessel as required under this Clause to be for Charterer's account and will be paid for at the price of bunkers at last load port at day of loading.

## 3. BONIFACIO STRAITS

The Vessel shall not pass through the Straits of Bonifacio under this Charter.

## 4. CARGO OPERATIONS CLAUSE

Charterer shall have the option to commingle, blend, add dyes, or additives, and / or carry out such other cargo operations ("cargo operations") as charterers may reasonably request; provided that such cargo operations are within the technical capability of the Vessel and that the Master considers it safe to do so.

Charterer indemnifies the Owner, Vessel and Master against liability for any cargo quality claims that may arise as a direct result of these onboard blending, including cargo quality claims from a third party.

Any additional charges that result directly from Charterer exercising such cargo operations, including demurrage, port charges, extra agency fees, consumed bunkers at documented replacement cost, etc., and which are not included in the freight agreed under Part I (G) of this Charter Party, shall be for the account of Charterer.

In case of blending operation, Charterer will surrender to Master all original Bills of Lading for the unblended cargo and the Master will provide new consolidated Bills of Lading on completion of blending operations, which Bills of Lading will reflect the actual grade that has been blended.

## 5. EFFICIENT DEMURRAGE CLAIM PROCESSING (JULY 1, 2002)

It is the Charterer's intention to pay demurrage due on a timely basis and for this purpose, we have set forth below a listing of the supporting documentation to be included with the demurrage claim

For purposes of demurrage under this C/P and with reference to Part II, clause 36: Supporting documentation, duly signed with authorized signatures, for demurrage claims shall include but not be limited to the following:

1. Completed STB Port Log for each port

2. Notice of Readiness message at all port(s)/berth(s)

3. Bills of Lading for co-loads and parcel tankers

4. Notes of protest given and/or received by the vessel

5. Pumping logs

6. Crude Oil Washing logs (if applicable)

7. Statement of facts/Port logs/Terminal time sheets

8. Agents' time sheets

Failure to receive all of the above documentation in the standard format prior to the time bar date will result in the claim being barred.

## 6. FLORIDA STRAIT TRANSIT

Vessel, when transiting the Florida Straits, from Key Biscayne South to the Dry Tortugas, shall maintain a distance of not less than ten miles off the outer navigational aids marking the reefs off the Florida Coast. It is understood and agreed that the fixture rate includes all compensation for Vessel track taken.

## 7.  HEIGHT OF MANIFOLD (AUGUSTA / BAYTOWN / WHANGAREI)

Owner warrants that Vessel can maintain maximum distance from manifold to waterline of (57' Augusta) (51' Baytown) (17.5 Meters Whangarei) on arrival and throughout the discharge.  If the Vessel is required to take on ballast to maintain the applicable distance, then always double valve segregation should be maintained between ballast and cargo and any delay to the Vessel by reason of taking on such ballast shall not count as laytime or, if the Vessel is on demurrage, as time on demurrage.

## 8. ITF CLAUSE

Owner warrants that the Vessel fully complies with all ITF requirements and that the Vessel has a valid ITF certificate or equivalent onboard.

## 9.  MESSINA STRAITS

The Vessel shall not pass through the Strait of Messina under this Charter party at any time without having Charterer's agreement obtained beforehand.

## 10.  NORTH SEA PILOT/SPECIFIC GUIDES

a.)   Owner is encouraged to consider the service of a duly qualified and competent deep sea pilot for all laden Vessel transits in the North Sea and/or English Channel Zone. Pilotage fees paid by Owner shall be reimbursed to Owner by Charterer to the extent same are reasonable. Owner shall provide Charterer with appropriate documentation for the fees paid. The pilot shall be and shall be deemed to be, an advisor to the Master of the Vessel which Master shall continue to be fully and solely responsible for the operation, management and navigation of the Vessel at all times.

b.)   The Vessel shall, during the Charter term, have on board, and the Master, officers and crew shall appropriately observe the requirements of, the most recent International Safety Guide for Oil Tankers and Terminals and the International Chamber of Shipping Bridge Procedure Guide.

c.)   The provisions of paragraphs (a) and (b) above, shall not be deemed, in any way, to lessen or alter any other obligations elsewhere in this Charter imposed upon or applicable to the Owner, the Vessel and/or Vessel Master, officers and crew.

## 11. PORT STANVAC CLAUSE

Owner warrants that the Vessel meets the following Port Stanvac requirements:

Part 1. For Vessels discharging at the SBM.

aa.   The Vessel is fitted with tongue type bow stoppers (76mm) in accordance with OCIMF recommendations.

bb.   Two suitable messenger lines of 24mm (1 inch) diameter and minimum 100 metres in length for lifting mooring pick up ropes are available for use.

cc.   Derrick or crane with a minimum of 10 tonne s.w.l. capable of being suitably positioned to lift S P.M. hoses.

dd.   The Vessel is capable of connecting 2 x 16" floating hoses and is fitted with suitable manifold bits and/or pad eyes for securing these hoses.

ee.   The Vessel is capable of maintaining 100 p.s.i. (minimum) at the Vessel's rail while discharging uphill to refinery tankage.

ff.   The Vessel is capable of clearing heavy product from the Port Stanvac SBM's submarine line within the Vessel's contractual pumping capability.

gg.   If the Vessel is loading, Vessel must be capable of receiving and segregating a line displacement of approximately 2500m$^3$ (maximum) of crude/product on board and discharging this crude/product back to the terminal if required.

hh.   Accommodation and meals will be provided for up to three shore personnel.

ii.   A responsible member of the Vessel's crew will be present on the forecastle at all times while the Vessel is moored to the SPM - to keep a look-out regarding distance/attitude of the Vessel to the buoy.

jj.   All ships moored at the SPM shall have main engine ready for immediate use at all times.

Part 2. For Vessels loading/discharging at the Product berth.

aa.   The maximum permissible displacement at the product berth is 42,000 Metric tons. This displacement may not be exceeded either on the Vessel's arrival or at any time whilst in the berth.

bb.   That minimum parallel body length in light condition is 49.0 meters.

cc.   Vessels freeboard shall not exceed 10.5 meters at any time, at any point along the maindeck.

dd.   Maximum draft at the product berth shall not exceed 10.70 meters.

## 12. ROTTERDAM HARBOR DUES

In the event Vessel under this Charter loads or discharges in the Port of Rotterdam, Esso Nederland B.V. may initiate claim and legal action against the Municipality of Rotterdam for the return of excessive harbor dues assessed on the Vessel.

Owner agrees:

(1)     to instruct Owner's appointed Vessel Agent to give Power of Attorney to Esso Nederland B.V. to present a Letter of Protest to the Municipality of Rotterdam concerning the level of Harbor dues imposed on the Vessel, with copy to Owner and Charterer; and

(2)     that Charterer or its designated affiliate may, at Charterer's cost or its affiliate's cost and in the name of Owner and/or Port Agent, make claim and commence legal proceedings against the Municipality of Rotterdam and/or other Rotterdam Authorities seeking recovery of Harbor dues paid by or on behalf of the Vessel and that any funds recovered (by judgment or settlement) be assigned and paid over to Charterer, or its designee. Owner agreeing to execute and deliver or have executed and deliver by its agent to Charterer or its designated affiliate such documents as may be reasonable required to affect the foregoing.

## 13. Security Regulations (June 10, 2004)

A.    This clause applies to all ports where either of the following security regulations ("Security Regulations") is in effect:

    1.    International Ship and Port Facility Security (ISPS) Code
    2.    U.S. Maritime Transportation Security Act of 2002

B.    Any delays to the Vessel at ports of loading or discharge due to the failure of the Vessel to comply with the Security Regulations shall be for Owner's account except where such delays are directly attributable to Charterer's failure to timely provide information required by the Security Regulations, in which case, the delays shall count as laytime or, if the Vessel is on demurrage, as time on demurrage.

C.    If demurrage is incurred under the Charter and the Vessel has been delayed in berthing, loading and/or discharging for any reason attributable to Security Regulations other than stipulated in Section B, above, such delay shall be deemed a Listed Condition under paragraph 14(b) of the Charter and that span of time on demurrage equal to the period(s) of delay described in this section C shall be paid at half rate.

D.    Expenses solely attributable to Security Regulations not otherwise specifically allocated in the Charter and/or WORLDSCALE shall be apportioned between Owner and Charterer consistent with the apportionment of delays set forth in sections B. and C. above.

## 14. SPEED UP

Charterer shall have the option, declarable at any time prior to commencement of laden voyage, or at any time during the laden voyage, to order Vessel to increase speed in the laden voyage up to _____ knots.

If the option to increase speed is exercised, the base freight rate shown in Part I, Clause G shall be increased by _____ Worldscale percentage point(s) per knot of increased speed for the actual time Vessel is operating at the increased speed.

In calculating the increased freight rate, the following formula shall be used:

Worldscale original rate
**PLUS (+)**
Miles steamed at increased speed
Total laden miles steamed
**TIMES (x)**
Worldscale percentage point increase

BP Worldwide Marine Distance Tables shall be used in obtaining Miles.

Vessel's Master will radio Charterer, advising date, time, Vessel's position when normal speed is effected, also Vessel's new speed and ETA discharge port.

Demurrage will remain unaltered and adjusted by original rate as shown in the Charter party.

## 15. STORAGE

1)      Charterer shall have the option of requiring the Vessel to wait en route at one or more places and/or discharge areas as floating storage at a safe anchorage. The period of storage shall be for up to _____ days with Charterer's option to terminate storage on giving Owner _____ days notice.

2)      In the event Charterer exercises the option to utilize Vessel as storage at a place en route, Charterer need only give minimal notice. If Charterer wish to utilize Vessel for storage at the discharge area, then Charterer shall, in this case, give minimum _____ days notice.

3)      Hire for storage shall be paid for at US Dollars _____ per day for the first _____ days, or prorata, and payments shall be made at completion of each fifteen (15) day period after arrival at storage area.

4)      If Vessel is required to wait en route, 50% of the ocean freight shall be payable to Owner not later than date which would be equivalent to that of four days after Vessel's theoretical arrival date at discharge point. If the Vessel is subsequently required to float at the discharge area, the balance of freight up to 80% shall be payable upon arrival at storage area. The remainder of freight is due upon discharge.

5)      Hotel bunkers shall be for Owner's account.

6)      Plus U.S. Dollars _____ per day or pro rata if Vessel is required to steam as below:

A.)     As requested by Charterer.

B.)     At master's discretion should the Vessel be unable to anchor or remain at anchor at the designated location due to weather conditions, bottom conditions or any other factor which, in the master's judgment, represents an unsafe situation.

C.)     No additional payment required for steaming to the initial discharge ports or berths as provided in Charter Party dated _____ provided the Charterer is responsible for any and all deviation incurred.

D.)     Owner warrants that Vessel's anchor and anchor chains are in good operational condition and will be maintained throughout Charter Party.

7)      Plus U.S. Dollars _____ per day or pro-rata if Vessel is required by Charterer to circulate the cargo within the Vessel's cargo tanks. No additional charge for the initial discharge of the Vessel's entire cargo as provided for under Charter Party

dated _____. Should the Vessel be required to reload and pump one or more times during storage period, the same rate to apply for all such discharge whether the Vessel is pumping alongside the dock or by ship-to-ship transfer.

8)   Should the port authorities require the Vessel to maintain the engine on standby with the steam on the boilers at the storage areas, the Charterer agrees to pay owner one half the rate in item No. 6.

All other terms, conditions, and exceptions to the Charter Party are to remain unaltered and in full force and effect.

## 16.  TURKISH STRAITS

Owner is to ensure that the Vessel will comply with the following :

1. Vessel shall transit through the Dardanelles and Bosphorus during daylight hours only with visibility in excess of two miles.

2. The Master of the vessel transiting the Dardanelles and Bosphorus is required to utilize the services of a qualified pilot in connection with the requirements of safe navigation.

3. Passage through the Dardanelles and Bosphorus shall be made in accordance with the recommendations set out in "the Strait of Istanbul, Sea of Marmara and The Strait of Ganakkale Routing Guide" (Published by the Turkish Department of Navigation, Hydrography and Oceanography)

Charterer is to pay the Owner all extraordinary costs in connection with complying with Charterer's instructions as regards to Bosphorus and Dardanelles transits (i.e. Additional tugs, pilots, time awaiting daylight hours crossing, additional bunkers consumed).

All costs payable to Owner in connection with complying with this Clause are to be invoiced with full supporting documentation.

## 17. U.S. GULF LIGHTERING WARRANTIES (Vers. 2005-1)

Owner warrants following (State yes or no):

(1) Master and Chief Officer have lightering experience or, if not Owners Port Captain to be on board during lightering operations. _____

(2) Vessel will have the following:
a) minimum of five closed chocks and three bollards available at the starboard side forward mooring station to accommodate a total of eight head lines. _____

b) two closed fairleads located approximately 35 meters max forward and aft of the center of manifold with associated mooring bollards and leads to winches as per OCIMF "Ship to Ship Tansfer Guide" and "Mooring equipment Guidelines." _____

c) minimum of three closed chocks and two bollards available at the starboard side aft (poopdeck) mooring station. _____

(3) Vessel's mooring wires are fitted with OCIMF synthetic tails, with  Mandel or Tonsberg connecting link shackles._____

(4) Vessel is able to maintain speed below 5.0 knots during lightering. _____

(5) Vessel can maintain manifold to waterline distance less than 24 meters throughout lightering, with trim not exceeding 6 meters. _____

(6) Vessel has closed chocks. _____

(7) Vessel not to bunker in U.S. Gulf while ExxonMobil cargo is aboard. _____

(8) Vessel to have four (4) messenger lines of 200 meters x 40 mm braided or plaited polyester or polypro-polyester construction._____

(9) Vessel has a Tank Vessel Examination (TVEL) that will be current on arrival at U.S. Gulf. _____(not always possible)

(10)  Vessel has a helicopter landing area that meets the ICS Guide to Helicopter/Ship Operations Requirements as seen in sections 4.2.1 or  4.2.2. _____

(11) Vessel will have four (4) watch officers at lightering site, not including the Master. _____

(12) Vessel will have a class approved personnel basket on board for use during lightering operation. _____

## 18.  VESSEL EXPERIENCE FACTOR (ARZEW / MEXICO)

A. For Vessels loading dirty petroleum products at Arzew, Algeria:
Owner will supply load port Vessel Experience Factor (VEF) data for this Vessel consistent with the latest edition of API MPMS Chapter 17. 1. The information should include port shore Total Calculated Volume (TCV), Vessel Total Calculated Volume After Load (TCV) and Vessel Total Calculated Volume Before Loading (On Board Quantity - OBQ) for 10 or more qualifying voyages.  For voyages whose volumes have been corrected to 60 degrees F with old Volume Correction Factor tables, the Owner shall provide shore and/or Vessel temperature data (These data requirements can be satisfied by having available in the ship's files, copies of the hand written report of the independent inspector which is normally left on board at the completion of loading plus the copy of the Bill of Lading for the voyage).

If data are not available for 10 voyages, this requirement may be met by supplying data on voyages subsequent to this Charter.  On request, the Owner shall provide copies of ullage forms used to calculate Vessel volumes.

B. The following data is required for loadings from Mexican ports:
1. Load date.
2. Load port.
3. Crude or feedstock type cargo.
4. Bill of Lading gross barrels.
5. Bill of Lading basis (i.e., shore figures or Vessel's figures).
6. Vessel's total cargo volume (TCV) after loading (at 60 degrees Fahrenheit including free water).
7. Vessel's OBQ (oil and water) before loading.
8. Vessel's cargo received (TCV - OBQ).
9. VEF (shore/ship) for each voyage.
10. Vessel's maximum cargo carrying capacity.
11. Last time ship was in drydock.

This information should be available for the previous twenty (20) successive loadings, except for loadings when the Vessel's figures were used for the Bill of Lading.  The data is required because the Bill of Lading figures for Mexican loadings are based on Vessel's figures adjusted for VEF.

If the data is lacking or unacceptable to Pemex, the Mexican State Petroleum Company, they will use a VEF of 1.00 which could be to the Receiver's disadvantage.

When a Vessel is nominated to load at a Mexican port, the VEF data should be supplied to ExxonMobil, Fairfax, and to the attending cargo inspectors at the loading port.

## 19. VGO CLEANING

Owner warrants that Vessel, upon arrival loadport, will have fresh water cleaned all cargo carrying compartments, pipes, pumps, and lines, and that the Vessel will be in all respects suitable for the carriage of vacuum gas oil utilizing the following operations:

A.    During the voyage to or at loadport, all cargo tanks, pumps and lines to be rinsed with fresh water, drained and stripped dry so that neither sodium nor sulfur contamination should exist.   This will include the removal from the cargo tanks of all excess water, bottom sediments and residues of previous cargoes.

B.    All sea suctions and other outboard valves connected to the cargo system must be sealed before and during loading.   Any delays as a result of Vessel not meeting Charterer's inspection satisfaction for cleaning at loadport, shall be for Owner's account and time not to count as laytime, or if vessel is on demurrage, as time on demurrage.

## 20. ASSIGNMENT (OUTCHARTERS)

**OUTCHARTERS:**

**Affiliate Owned Tonnage: add**

"Notwithstanding any other provisions of this Charter Party, Owner may sell, or otherwise transfer ownership in, the Vessel and/or assign all of its rights and delegate all of its obligations under this Charter Party to any affiliate (The term "affiliate" shall mean any company which is directly or indirectly owned or controlled, in whole or in part by Exxon Mobil Corporation), said affiliate, in the case of a transfer of Vessel ownership, having the option to change the Vessel's flag."

**Non Affiliate Owned Tonnage: add**

"Notwithstanding any other provisions of this Charter Party, Owner may assign all of its rights and delegate obligations under this Charter Party to any affiliate (The term "affiliate" shall mean any company which is directly or indirectly owned or controlled, in whole or in part by Exxon Mobil Corporation)."

## 21.  BILL OF LADING / INDEMNITY (OUTCHARTERS)

Special Bill of Lading Clause - Replacing Clause 27 (c) through (f) of ExxonMobil VOY2005.

(a).  Except as provided in Paragraph (b) of this Clause, Owner and Vessel shall not be required to deliver cargo at a discharging port or place nominated by Charterer unless the party claiming right to such delivery shall first surrender to Vessel at such port or place one of the original Bills of Lading issued for the cargo, duly endorsed; provided however that, if the Bills of Lading name specific port(s) or place(s) of discharging and the nominated port or place is different or if the Bills of Lading provide for discharge at port(s) or place(s) as ordered, Owner and Vessel shall not be required to deliver the cargo unless the party claiming right to such delivery first surrenders to Vessel all the original Bills of Lading, duly endorsed. The foregoing shall apply even in the situation where one but not all of the original Bills of Lading have been placed on board Vessel at loading port, in such case, only the original Bill(s) of Lading not on board Vessel need first to be surrendered to Vessel in accordance with the foregoing requirements. Any delay to Vessel at the nominated port or place due to the unavailability at such port or place of original Bill(s) of Lading and/or the failure to timely surrender such Bill(s) of Lading to Vessel in accordance with the foregoing requirements shall count as laytime or, if Vessel is on demurrage, as time on demurrage.

(b).  If original Bill(s) of Lading are not available at the discharging port or place for timely surrender to Vessel as provided in Paragraph (a) of this Clause, Vessel shall deliver the cargo to a party and at a facility at the discharging port or place as directed by Charterer in writing by letter, telex, electronic mail or facsimile, if Charterer (or, at Owner's option, the parent of Charterer or other entity suitable to Owner) first executes a written indemnity in connection with such delivery in favor of Owner, Vessel, any Chartered Owner(s) of Vessel, Master, Vessel operators, agents and underwriters and delivers such indemnity to Owner or Owner's designee; provided however that, if Owner deems it desirable, Charterer shall also provide to Owner, as an added precondition to such delivery, a back-up guaranty or irrevocable letter of credit issued or confirmed by a bank acceptable to Owner.  The subject indemnity shall meet the requirements of Paragraph (c) of this Clause and any back-up bank guaranty or letter of credit shall be in form and wording acceptable to Owner.

(c )  The indemnity referred to in Paragraph (b) of this Clause shall be a short form indemnity document incorporating the terms and conditions set forth in Paragraph (d) of this Clause. This document (which must be properly filled in) shall be given to Owner by telex, electronic mail, letter or facsimile as requested by Owner and be in the exact form as quoted below, which document, when transmitted, shall be deemed to have been signed by person acting on behalf of Charterer or other indemnity giver.

"VOYAGE CHARTER OF

DATED     _____

BETWEEN    _____ , AS OWNER

AND

_____ , AS CHARTERER

Reference is made to the cargo ('Cargo') now laden aboard the above Vessel ('Vessel'). Pursuant to Paragraph (c) of the Special Bill of Lading Clause of the above captioned Charter ('Charter'), the undersigned requests that Owner(s) of the Vessel deliver the Cargo at _____ unto _____ without prior discharge site presentation to the Vessel of all original bills of lading issued for the Cargo appropriately endorsed for such delivery and/or at a discharge port or site other than one specifically named in said bills of lading.

In consideration of such delivery, the undersigned hereby gives an indemnity containing the terms and conditions set forth in Paragraph (d) of the Special Bill of Lading Clause of the Charter ("Indemnity Terms and Conditions"). The Indemnity Terms and Conditions are deemed incorporated and made part of this document. The term 'Indemnifier' in the Indemnity Terms and Conditions shall be deemed to refer to the undersigned. The term 'Cargo' and the phrase 'Requested Delivery' in the Indemnity Terms and Conditions shall be deemed to, respectively, mean the Cargo and the delivery request set forth in the preceding paragraph of this document. The term "Ship" as used in the Indemnity Terms and Conditions shall be deemed to refer to the Vessel. Print the following information:

Name of Charterer *
Name of Person Acting on     _____
Behalf of Charterer

                                     _____

Authority/Title of Above Person    _____

Date Indemnity Given           _____

* Note: If, in accord with Paragraph (b) of this clause, Owner requires the indemnity to be given by an entity other than Charterer, insert full name of that entity instead of name of Charterer

(d) Indemnity Terms and Conditions.
"1. Indemnifier shall indemnify and hold harmless the Owner of the Ship, any chartered Owner of the Ship, the Ship operator, the Ship Master, the Ship underwriters and the Ship agents (hereinafter jointly and individually called "Indemnitees") in respect of any liability, loss, damage, costs (including, but not limited to, Attorney/Client costs) and other expense of whatever nature which the Indemnitees may sustain or incur by reason of the Requested Delivery.

2.  In the event of any legal action or proceedings being commenced against the Indemnitees in connection with the Requested Delivery, Indemnifier shall provide Indemnitees from time to time, on the Indemnitees' demand, with sufficient funds to defend same.

3.  If the Ship or any other vessel or other property belonging to the Indemnitees should be arrested or detained  or if the arrest or detention thereof should be threatened for any claim in connection with the Requested Delivery,  the Indemnifier shall provide, upon demand of the Indemnitees, such bail or other security as may be required to prevent such arrest(s) or detention(s) or to secure the release of the Ship or such vessel or other property from arrest or detention, and shall indemnify and hold harmless the Indemnitees against and from any loss, damage, costs (including, but not limited to, Attorney/Client costs) and other expense resulting from such arrest or detention or threatened arrest or detention, whether or not same may be justified and to pay to the Indemnitees, on the Indemnitees' demand, the amount of such loss, damages, costs and/or expense.

4.  The within Indemnity shall become null and void upon the receipt by the Ship Owner of all original bills of lading issued for the Cargo duly endorsed so as to document the Requested Delivery.

5.  The within Indemnity shall be governed and construed in accordance with the internal substantive laws of New York, USA. The Indemnitees may, but shall not be obligated to, bring any legal action or proceeding with respect to such Indemnity in the Courts of the State of New York, USA or in the U.S. Federal Court situated therein and the Indemnifier unconditionally and generally accepts in regard to such legal action or proceeding, for itself and its property, the jurisdiction and venue of the aforesaid courts."

(e) This Clause, consisting of Paragraphs (a) through (e), shall be referred to as "Special Bill of Lading Clause" in the indemnity document quoted in Paragraph (c) of this Clause.

## 22.  CARGO LOSS  ALLOCATION CLAUSE (CO-LOADS)

The following procedures shall be used to provide compensation for the differences in the cargo volume received when there are multiple cargo owners.

$$\text{Allocation Factor} = \frac{\text{(Sum Total NSV BOLs)}}{\text{(Sum Total NSV Outturn)}}$$

$$\text{NSV Allocated Parcel Load} = \text{(NSV Parcel Outturn) times (Allocation Factor)}$$

$$\text{NSV Volume Adjustment} = \text{(NSV Allocated Parcel Load) minus (NSV Parcel BOL)}$$

An appropriate debit/credit is to be issued to each cargo owner upon completion of the allocation such that all cargo owners shall have the same NSV shore to shore loss percent. The basis for payment shall be the "NSV Volume Adjustment" multiplied by the weighted average price of all crudes in the shipment. Platts or other agreeable industry source may be used to establish the cargo price.

All measurements shall be in accordance with the latest API standards. All volumes shall be calculated using the 1980 Petroleum Measurement Tables. All loadings and discharges shall be attended by independent cargo inspector(s) mutually acceptable to all parties. Each party shall instruct their inspectors to provide promptly to all cargo owners, the outturn volumes (NSV) at each respective discharge ports.

The above is without prejudice to either party's right to file a cargo shortage or loss claim. Any claim settlements shall be prorated amongst all cargo owners.

## 23.  INTERPRETATION CLAUSE (OUTCHARTERS)

Notwithstanding any other provision in this Charter or any other document, neither this Charter nor any other document shall constitute an agreement by Owner or Charterer to take any action or refrain from taking any action that is in conflict with, penalized under or compliance with which is prohibited by U.S. law.

## 24. LAYTIME ACCOUNTING (CO-LOADS)

If same port(s) are used in load or discharge by partners, laytime used at such port(s) to be shared in proportion to the quantities loaded/discharged by each partner at such port.  If different port(s) used, time to count separately.  It is understood and agreed that specific delays caused by or attributed to either partner only shall be borne by that partner.

## 25.  LIGHTERING CLAUSE (OUTCHARTERS)

All lightering operations are to be conducted as per the latest OCIMF standards for ship to ship transfers. Lightering location(s) and lightering vessel(s) shall be approved by Owner or disponent Owner, but same is not to be unreasonably withheld.

*Exhibit "2"*

**Tax Invoice**

## Navig8 Pool Inc.,
Trust Company Complex, Ajeltake Road, Ajeltake Island,
Majuro, Marshall Islands, MH 96960

STANDARD TANKERS BAHAMAS C/O EXXONMOBIL
REFINING & SUPPLY CO
3225 GALLOWS ROAD
FAIRFAX, V.A. 22037-0001

| | |
|---|---|
| Invoice Date: | 11 January 2010 |
| Invoice No. | DEM-580 |
| Voyage: | 5 |

### DEMURRAGE INVOICE

| Description of Services | Rate (USD) | Amount (USD) |
|---|---|---|
| **ABU DHABI STAR - C/P 24 NOVEMBER 09** | | |
| LOADPORT:               BONNY | | |
| DISCHARGE PORT:     SAVANNAH | | |
|                                         JACKSONVILLE | | |
| Demurrage (as per attached supporting docs) | 16,250.00 | 88,020.83 |
| Less: Address Commission | 1.25% | (1,100.26) |
| | **NET AMOUNT PAYBLE** | 86,920.57 |

E. & O. E.

FREIGHT TO BE PAID IN USD TO:

| | |
|---|---|
| Bank | Citibank, N.A., Singapore Branch |
| Account No (USD) | 0-850600-007 |
| Beneficiary Name: | NAVIG8 POOL INC |
| Swift code | CITISGSG |
| Branch code | 001 |
| Bank code | 7214 |
| Bank address | Transaction Exchange Centre |
| | 3 Temasek Avenue, |
| | #11-00 Centennial Tower, |
| | Singapore 039190 |

Please ensure the amount is remitted in FULL, without any deduction of bank charges

* WIRE TRANSFER ORIGINATOR TO DISCLOSE ALL ITS
NECESSARY PARTICULARS TO COMPLY WITH MAS
(MONETARY AUTHORITY OF SINGAPORE NOTICE 626
AND COMPULSORY INTERNATIONAL REGULATION

PAYMENT TERMS:
PROMPT NET CASH BY TELEGRAPHIC
TRANSFER OF IMMEDIATELY AVAILABLE
FEDERAL FUNDS

PLEASE INDICATE OUR INVOICE NO.,
VESSEL NAME & VOYAGES NO. IN YOUR
REMITTANCE ADVICE

## Laytime Calculation

| Vessel | : | Abu Dhabi Star | Owner | : | Navig8 Pool Inc | Laycan | : | 30Nov2009-01Dec2009 |
|--------|---|----------------|-------|---|-----------------|--------|---|---------------------|
| Ref | : | Voyage 5 (2009/0696) | Cargo | : | naptha | | | |
| CPDate | : | 24Nov2009 | Charterer | : | STANDARD TANKERS BAHAMAS C/O Exxonmobil Refining & Supply Co | | | |

|  | Count |  | % |  |  |  |  |  |  |
|--|-------|--|---|--|--|--|--|--|--|
| **LOADING - BONNY** | | | | | | | | | |
| B/L Date 02Dec2009 | | | | | | | | | |
| Arrived | 29Nov2009 11:48 | | | | | | | | |
| NOR | 30Nov2009 00:01 | | | | | | | | |
| Anchor Aweigh | 01Dec2009 04:00 | | | | | | | | |
| All Fast | 01Dec2009 11:00 | | | | | | | | |
| Hoses connected | 01Dec2009 14:30 | | | | | | | | |
| Commenced | 01Dec2009 15:12 | | | | | | | | |
| Completed | 02Dec2009 22:12 | | | | | | | | |
| Hoses disconnected | 03Dec2009 00:12 | | | | | | | | |
| Docs Signed | 03Dec2009 04:42 | | | | | | | | |
| Left Berth | 03Dec2009 07:12 | | | | | | | | |
| **Time To Count From** | **Start** | **30Nov2009 06:00** | | | | | | | |
| **Time To Count To** | **End** | **03Dec2009 07:12** | | 73 | hrs | 12 | min | | |
| Less Shifting to berth 1Dec 04:00 - 11:00 | | | 100 | - 7 | hrs | 0 | min | | |
| Less doc allowance 3Dec 00:12 - 03:12 | | | 100 | - 3 | hrs | 0 | min | | |
| | | Total in Port | | 63 | hrs | 12 | min | 63.200000 | hrs |
| **DISCHARGING - SAVANNAH** | | | | | | | | | |
| Arrived | 19Dec2009 05:30 | | | | | | | | |
| NOR | 19Dec2009 06:18 | | | | | | | | |
| Anchored | 19Dec2009 06:18 | | | | | | | | |
| Anchor Aweigh | 23Dec2009 13:42 | | | | | | | | |
| All Fast | 23Dec2009 18:48 | | | | | | | | |
| Hoses connected | 23Dec2009 21:48 | | | | | | | | |
| Commenced | 23Dec2009 23:06 | | | | | | | | |
| Completed | 24Dec2009 18:48 | | | | | | | | |
| Hoses disconnected | 24Dec2009 20:12 | | | | | | | | |
| **Time To Count From** | **Start** | **19Dec2009 12:18** | | | | | | | |
| **Time To Count To** | **End** | **24Dec2009 20:12** | | 127 | hrs | 54 | min | | |
| Less shifting to berth 23Dec 13:42 - 18:48 | | | 100 | - 5 | hrs | 6 | min | | |
| | | Total in Port | | 122 | hrs | 48 | min | 122.800000 | hrs |
| **DISCHARGING - JACKSONVILLE** | | | | | | | | | |
| NOR | 25Dec2009 19:00 | | | | | | | | |
| All Fast | 25Dec2009 23:48 | | | | | | | | |
| Hoses connected | 26Dec2009 02:48 | | | | | | | | |
| Commenced | 26Dec2009 03:54 | | | | | | | | |
| Completed | 26Dec2009 14:24 | | | | | | | | |
| Hoses disconnected | 26Dec2009 15:48 | | | | | | | | |
| **Time To Count From** | **Start** | **25Dec2009 23:48** | | | | | | | |
| **Time To Count To** | **End** | **26Dec2009 15:48** | | 16 | hrs | 0 | min | | |
| | | Total in Port | | 16 | hrs | 0 | min | 16.000000 | hrs |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Total Time Used** | | 202 | hrs | 0 | min | 202.000000 hrs |
| **Less Time Allowed** | | - 72 | hrs | 0 | min | - 72.000000 hrs |
| **On Demurrage** | | 130 | hrs | 0 | min | 130.000000 hrs |
| **At Full Rate** | 16,250.00 | | | | | |
| **Total Amount** | | | | | | **USD 88,020.83** |



STANDARD TANKERS BAHAMAS C/O Exxonmobil
Refining & Supply Co

3225 Gallows Road
Fairfax, V.A. 22037-0001

Invoice Date   17Jun2010

Invoice No   Proforma
Our Reference   2009/696

## DEMURRAGE INVOICE

| C/P Date: | 24Nov2009 | Voyage no.: | 5 |
|---|---|---|---|
| Vessel: | Abu Dhabi Star | | |
| Charterer: | STANDARD TANKERS BAHAMAS C/O Exxonmobil Refining & Supply Co | | |
| Fixture Ref.: | 2009/696 | | |

**Note all values are in USD**

| | |
|---|---|
| Demurrage naptha: Loading Bonny Discharging Savannah,Jacksonville | 77,943.58 |
| Address Commission of 1.250% | -974.29 |
| TOTAL | 76,969.29 |

E. & O. E.

*PLEASE INDICATE OUR INVOICE NO., VESSEL NAME & VOYAGE NO. IN YOUR REMITTANCE ADVICE*

*PAYMENT TERMS:*
*PROMPT NET CASH BY TELEGRAPHIC TRANSFER OF IMMEDIATELY AVAILABLE FEDERAL FUNDS*
*\* WIRE TRANSFER ORIGINATOR TO DISCLOSE NECESSARY PARTICULARS TO COMPLY WITH MAS*
*(MONETARY AUTHORITY OF SINGAPORE) NOTICE 626 & COMPULSORY INTERNATIONAL REGULATION*

CITIBANK,N.A., SINGAPORE BRANCH
ACCOUNT NO.: 0-850600-007
BENEFICIARY NAME: NAVIG8 POOL INC
SWIFT CODE: CITISGSG
BANK CODE: 7214
BRANCH CODE: 001

## Laytime Calculation

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Vessel | : | Abu Dhabi Star | Owner | : | Navig8 Pool Inc | Laycan | : 30Nov2010-01Dec2010 |
| Ref | : | Voyage 5 (2009/0696 VOY) | Cargo | : | naptha | | |
| CPDate | : | 24Nov2009 | Charterer | : | STANDARD TANKERS BAHAMAS C/O Exxonmobil Refining & Supply Co | | |

| | Count | | % | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **LOADING - BONNY** | | | | | | | | | |
| B/L Date 02Dec2009 | | | | | | | | | |
| Arrived | | 29Nov2009 11:48 | | | | | | | |
| NOR | | 30Nov2009 00:01 | | | | | | | |
| Anchor Aweigh | | 01Dec2009 07:42 | | | | | | | |
| All Fast | | 01Dec2009 11:00 | | | | | | | |
| Hoses connected | | 01Dec2009 14:30 | | | | | | | |
| Commenced | | 01Dec2009 15:12 | | | | | | | |
| Completed | | 02Dec2009 22:12 | | | | | | | |
| Hoses disconnected | | 03Dec2009 00:12 | | | | | | | |
| Docs Signed | | 03Dec2009 03:12 | | | | | | | |
| Left Berth | | 03Dec2009 07:12 | | | | | | | |
| **Time To Count From** | **Start** | **30Nov2009 06:01** | | | | | | | |
| **Time To Count To** | **End** | **03Dec2009 03:12** | | 69 | hrs | 11 | min | | |
| Less Shifting to berth 1Dec 07:42 - 11:00 | | | 100 | - 3 | hrs | 18 | min | | |
| Less pratique 1Dec 11:00 - 13:00 | | | 100 | - 2 | hrs | 0 | min | | |
| Less doc allowance 3Dec 00:12 - 02:12 | | | 100 | - 2 | hrs | 0 | min | | |
| Less awaiting daylight 30Nov 19:30 - 1Dec 07:42 | | | 100 | - 12 | hrs | 12 | min | | |
| | | Total in Port | | 49 | hrs | 41 | min | 2.0701389 | days |
| **DISCHARGING - SAVANNAH** | | | | | | | | | |
| Arrived | | 19Dec2009 05:30 | | | | | | | |
| NOR | | 19Dec2009 06:18 | | | | | | | |
| Anchored | | 19Dec2009 06:18 | | | | | | | |
| Anchor Aweigh | | 23Dec2009 13:42 | | | | | | | |
| All Fast | | 23Dec2009 18:48 | | | | | | | |
| Hoses connected | | 23Dec2009 21:48 | | | | | | | |
| Commenced | | 23Dec2009 23:06 | | | | | | | |
| Completed | | 24Dec2009 18:48 | | | | | | | |
| Hoses disconnected | | 24Dec2009 20:12 | | | | | | | |
| **Time To Count From** | **Start** | **19Dec2009 12:18** | | | | | | | |
| **Time To Count To** | **End** | **24Dec2009 20:12** | | 127 | hrs | 54 | min | | |
| Less shifting to berth 23Dec 13:42 - 18:48 | | | 100 | - 5 | hrs | 6 | min | | |
| Less pratique 23Dec 18:48 - 20:10 | | | 100 | - 1 | hrs | 22 | min | | |
| | | Total in Port | | 121 | hrs | 26 | min | 5.0597222 | days |
| **DISCHARGING - JACKSONVILLE** | | | | | | | | | |
| Arrived | | 25Dec2009 18:00 | | | | | | | |
| NOR | | 25Dec2009 19:00 | | | | | | | |
| All Fast | | 25Dec2009 23:48 | | | | | | | |
| Hoses connected | | 26Dec2009 02:48 | | | | | | | |
| Commenced | | 26Dec2009 03:54 | | | | | | | |
| Completed | | 26Dec2009 14:24 | | | | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Hoses disconnected | | 26Dec2009 15:48 | | | | | | |
| Docs On Board | | 26Dec2009 16:00 | | | | | | |
| Left Berth | | 26Dec2009 18:00 | | | | | | |
| Time To Count From | Start | 25Dec2009 23:48 | | | | | | |
| Time To Count To | End | 26Dec2009 15:48 | | 16 | hrs | 0 | min | | |
| | | Total in Port | | 16 | hrs | 0 | min | 0.6666667 | days |
| Total Time Used | | | | 187 | hrs | 7 | min | 7.7965278 | days |
| Less Time Allowed | | | | - 72 | hrs | 0 | min | - 3.0000000 | days |
| On Demurrage | | | | 115 | hrs | 7 | min | 4.7965278 | days |
| At Full Rate | | 16,250.00 | | | | | | | |
| | | **Total Amount** | | | | | USD 77,943.58 | | |

Generated by SoftMAR

*Exhibit "3"*

**gard**

**Gard (North America) Inc.**
**P&I**

30 Broad Street (43rd Floor)
New York, NY 10004-2944
U.S.A

Tel   +1 212 425 5100
Fax  +1 212 425 8147

gardna@gard.no
www.gard.no

15 September 2010

By Fax & Email

Standard Tankers Bahamas Ltd. UK Branch
c/o  Mr. Steve Sambridge
Manager, Claims Department
E.A. Gibson Ltd., - Shipbrokers

Email:      claims@eagibson.co.uk
Fax:        +44 20 7405 0403

### Notice of appointment of arbitrator

### *M/V ABU DHABI STAR– C/P dated 24 November 2009–Demurrage Dispute*

Dear Mr. Sambridge,

We have appointed Mr. Manfred W. Arnold as arbitrator on behalf of our Member, Messrs. Navig8 Pool Inc., Disponent Owner of the ABU DHABI STAR. Mr. Arnold's appointment is in respect of any and all disputes under the charterparty dated 24 November 2009.

We call upon you to appoint your arbitrator under the terms of the charterparty no later than 20 days after the service of this notice upon you. If you are agreeable we would accept from our side that Mr. Arnold act as sole arbitrator.

Mr. Arnold's contact details are:
840 Shackamaxon Drive
Westfield, NJ 07090

Phone: 908-232-6155
Fax:    908-232-6886
E-mail: arnoldwestmarine@comcast.net

We look forward to hearing from you.

Yours sincerely,

Gard (North America) Inc.

Hugh A. Forde
Claims Executive / Lawyer
hugh.forde@gard.no

By: Air Mail
CC:     Standard Tankers Bahamas Ltd.
        Mailpoint 34
        ExxonMobil House, Ermyn Way
        Leatherhead, Surrey
        KT22 8UX
        England

By: e-mail
CC:     Mr. Manfred W. Arnold
        840 Shackamaxon Drive
        Westfield, NJ 07090
        arnoldwestmarine@comcast.net

By: e-mail
CC:     Standard Tankers Bahamas Ltd. – UK Branch
        c/o ExxonMobil Business
        Support Center Hungary Ltd.
        H-1139 Budapest, VACI UT 81-85
        Center Point Building, 4th Floor
        Attn: PMI Claims Coordination
        HUNGARY
        LPGOPS@exxonmobil.com
        intltranspeur@exxonmobil.com

*Exhibit "4"*



**Gard (North America) Inc.**
**P&I**

30 Broad Street (43rd Floor)
New York, NY 10004-2944
U.S.A

Tel   +1 212 425 5100
Fax   +1 212 425 8147

gardna@gard.no
www.gard.no

26 October 2010

By Fax & Email

Standard Tankers Bahamas Ltd, UK Branch
c/o  Mr. Steve Sambridge
Manager, Claims Department
E.A. Gibson Ltd., - Shipbrokers

Email:    claims@eagibson.co.uk
Fax:      +44 20 7405 0403

### _M/V ABU DHABI STAR– C/P dated 24 November 2009–Demurrage Dispute_

Dear Mr. Sambridge,

We refer to our facsimile and email dated 15 September 2010 advising of the appointment of Mr. Manfred W. Arnold as arbitrator on behalf of our Member, Messrs. Navig8 Pool Inc., Disponent Owner of the ABU DHABI STAR in respect of any and all disputes under the captioned charterparty dated 24 November 2009.

In that same notification facsimile and email, we called upon you to appoint your arbitrator under the terms of the charterparty no later than 20 days after the service of the notice upon you and provided you with Mr. Arnold's contact details.  We further indicated that we would accept that Mr. Arnold act as sole arbitrator if you were in agreement as well.

We have not received a response from you as of today.  Please let us know whether Charterer will accept Mr. Arnold as sole arbitrator or, if not, the identity of Charterer's nominated arbitrator.  In the event that we do not hear from you in response to the above on or before Friday, 5 November, Owner hereby reserves the right to compel Charterer to appoint its arbitrator and proceed forthwith to arbitration.  Please be guided accordingly.

Yours sincerely,


Gard (North America) Inc.

Hugh A. Forde
Claims Executive / Lawyer
hugh.forde@gard.no

By: Air Mail
CC:    Standard Tankers Bahamas Ltd.
        Mailpoint 34
        ExxonMobil House, Ermyn Way
        Leatherhead, Surrey
        KT22 8UX
        England

By: Air Mail
CC:    Standard Tankers Bahamas Ltd.
        Center Point Building, 4th Floor
        H-1139 Budapest, VACI UT 81-85
        HUNGARY